644 F.2d 147
 7 Fed. R. Evid. Serv. 674
 ROMEO, Nicholas, an incompetent, by his mother and next
friend, Paula Romeo, Appellant,
v.
Duane YOUNGBERG, individually and in his official capacity
as Superintendent, Pennhurst State School and Hospital, and
Richard Matthews, individually and in his official capacity
as Director of Resident Life, Pennhurst State School and
Hospital, and Marguerite Conley, individually and in her
official capacity as Unit Director, Unit 9, Pennhurst State
School and Hospital.
 No. 78-1982.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 9, 1979.
Reargued En Banc April 28, 1980.
Decided Nov. 24, 1980.
As Amended Dec. 12, 1980.
Certiorari Granted May 18, 1981.
See 101 S.Ct. 2313.
 
 Edmond A. Tiryak (argued), Elliot B. Platt, Community Legal Services, Philadelphia, Pa., for appellant.
 Gerald Gornish, Acting Atty. Gen., David H. Allshouse, Norman J. Watkins, Deputy Attys. Gen., Chief, Civ. Litigation, Dept. of Justice, Harrisburg, Pa., Jonathan Wheeler, Frank, Margolis, Edelstein & Scherlis, Joseph W. McGuire (argued), McWilliams, Baulis & Silverman, Philadelphia, Pa., for appellees.
 Argued Jan. 9, 1979.
 Before SEITZ, Chief Judge, and GIBBONS and HIGGINBOTHAM, Circuit Judges.
 Reargued April 28, 1980.
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 The present controversy inhabits the twilight area of developing law concerning the constitutional rights of the involuntarily committed mentally retarded. Nicholas Romeo appeals, through his next friend, from a jury verdict for the defendants, officials of the Pennhurst State School and Hospital, in a suit brought pursuant to 42 U.S.C. § 1983 (1976). Plaintiff alleges trial errors in the admission and exclusion of evidence, in the court's instructions to the jury and in the manner in which the trial was conducted. Because of the improper exclusion of relevant expert medical testimony and critical flaws in the standards that were employed in charging the jury, we vacate the judgment of the district court and remand for a new trial.
 
 
 2
 While courts in the past decade have carefully focused on the procedural protections applicable to the initial commitment of the mentally handicapped, see Parham v. J. R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), relatively little has been resolved with respect to conditions of confinement or the extent of the state's duty to protect and to treat the institutionalized. Specifically at issue here is the judicial responsibility to enforce constitutional guarantees governing the incarceration of the institutionalized retarded.[1] This, in turn, calls on us to deal with the question of what standards of proof are required in a § 1983 suit for damages, in which a mentally retarded plaintiff claims that the defendants improperly shackled him, failed to provide adequate protection for him, and did not make appropriate treatment available to him. In defining the principles relating to claims for protection and treatment of the retarded, carefully crafted instructions must be utilized that will reflect the duty of courts to safeguard the constitutional rights of those confined, but also will be sensitive to the prerogative of the medical community to exercise its professional judgment and to the undeniable fiscal and administrative concerns of the state.
 
 I.
 
 3
 Romeo is a profoundly retarded person. Although he is physically thirty years old, he suffers from a chemical imbalance of the brain that renders his mental capacity approximately that of an eighteen month old child. For the first twenty-six years of his life Romeo lived with his parents in South Philadelphia. On May 10, 1974 his father died. Within a month his mother, finding herself unable to care for him, applied to the Philadelphia Common Pleas Court for his admission to a mental retardation facility. On July 11, 1974, the court committed Romeo to the Pennhurst State School and Hospital, pursuant to the involuntary commitment provision of the Pennsylvania Mental Health & Mental Retardation Act of 1966. Pa.Stat.Ann. tit. 50, § 4406 (Purdon) (1969).
 
 
 4
 It is not contested that, while confined at Pennhurst, Romeo was injured on over seventy occasions. These injuries were both self-inflicted and the result of attacks by other residents, some in retaliation against Romeo's aggressive behavior. The injuries included a broken arm, a fractured finger, injuries to sexual organs, human bite marks, lacerations, black eyes, and scratches. Moreover, some of plaintiff's injuries became infected, either from inadequate medical attention or from contact with human excrement that the Pennhurst staff failed to clean up.
 
 
 5
 Since Romeo is incompetent, this action was brought on his behalf by his mother as next friend. The § 1983 complaint seeks damages for the described injuries from three officials at Pennhurst: C. Duane Youngberg, then superintendent, Richard Matthews, director of resident life, and Marguerite Conley, director of the plaintiff's assigned unit at the time most of the injuries occurred. There is evidence which indicates that each defendant knew of some or all of the seventy-plus injuries suffered by Romeo.
 
 
 6
 After the case was filed, the district court permitted the plaintiff to amend the complaint to include allegations that, since the initiation of the suit, defendants had kept Romeo shackled to a bed or a chair in the hospital at Pennhurst for long periods each day. The amended complaint, which posited a violation of plaintiff's constitutional right to treatment occasioned by the shackling, exposure to attacks and inappropriate treatment,[2] again sought compensatory and punitive damages from the defendants.[3]
 
 
 7
 At the time of trial, the district court refused to permit plaintiff's two experts. Dr. Foxx and Dr. Grover, to testify about the lack of programming and activities on Romeo's ward, which they believed accounted for his numerous injuries, and about alternative methods of treatment that would have reduced the frequency of attacks.[4] One of the experts would have testified further that the restraints served no medical purpose and were used solely for the convenience of the staff. The court sustained objections to all of this proffered medical and psychiatric testimony on the theory that admission of such evidence would transform a § 1983 action into a malpractice case.[5] In addition, the court rejected the plaintiff's proposed jury instruction which maintained that the plaintiff had a right to treatment in the least restrictive environment. The court decided instead that defendants' shackling practices and duty to protect Romeo should be evaluated solely on the basis of an Eighth Amendment standard. Further, in what was described as an attempt to distinguish this § 1983 suit from a malpractice case, the court subjected plaintiff's claims of inadequate treatment to an Eighth Amendment standard of "deliberate indifference to the serious medical needs of the resident."
 
 
 8
 Because we believe that the Eighth Amendment which limits the scope of judicial review of conditions of incarceration for the criminally convicted to a "cruel and unusual" threshold is inappropriate in the context of civil as distinguished from criminal confinement, the result reached in the district court must be vacated. Moreover, the uncharted legal issues which have arisen and the potential ramifications of this case impel us to set out in some detail the level of judicial scrutiny that should be accorded the intricate set of legal, medical and societal interests that intersect in the situation presented here.
 
 II.
 
 9
 Of critical importance in this appeal is the recognition that this is a due process case, not a controversy to be governed by "cruel and unusual" principles. Although the complaint alleged Eighth as well as Fourteenth Amendment violations, Ingraham v. Wright[6] and Bell v. Wolfish[7] would appear to preclude reliance on the minimal safeguards of the Eighth Amendment in a non-criminal context. Ingraham held that the Cruel and Unusual Punishments Clause is inapplicable in the context of corporal punishment in public schools; Wolfish found Eighth Amendment scrutiny inappropriate for evaluating conditions of pretrial detention.[8] Indeed, Wolfish explicitly recognizes a right of innocent persons to be free from punishment, a proposition directly grounded in the word "liberty" that appears in the Due Process Clause. See 441 U.S. at 535, 99 S.Ct. at 1872, id. at 580, 99 S.Ct. at 1896. (Stevens, J., dissenting). Thus, it is the Fourteenth Amendment's prohibition of state deprivation of life, liberty or property without due process of law that is the appropriate fulcrum of our concerns today.
 
 
 10
 It is necessary, of course, to determine initially whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of life, liberty and property. If the answer to that inquiry is in the affirmative, we must then determine what level of judicial scrutiny is applicable to the various interests in issue here.
 
 
 11
 We are fully cognizant that the propriety of a § 1983 claim, in the present situation, turns on whether a constitutional right is at issue. The concurrence is undeniably correct in requiring that we distinguish between constitutional violations and ordinary malpractice claims. But the implication that the existence vel non of a state remedy for example a malpractice action is relevant to the determination of whether a § 1983 claim exists, would appear to be unfounded. Cf. Paul v. Davis, 424 U.S. 693, 715, 96 S.Ct. 1155, 1167, 47 L.Ed.2d 405 (1976) (Brennan, J., dissenting). Nor does the existence of treatment issues in a claim of constitutional infringement, on account of a linguistic similarity, transform the claim into a malpractice action.[9] Admittedly, the plaintiff's confinement in a state institution does not dignify every complaint with constitutional stature. Cf. Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Nevertheless, there is a distinction for constitutional purposes between conduct by state actors and private citizens. Therefore, understandable concerns with stemming the federalization of common law tort actions, see Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), must not overcome a court's duty to safeguard legitimate constitutional rights.[10] As Justice Harlan realized, " 'liberty' is not a series of isolated points pricked out in terms of (the Bill of Rights) .... It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints." Poe v. Ullman, 367 U.S. 497, 543, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (dissenting opinion).
 
 
 12
 Once a protected interest is found to exist, the proper level of judicial scrutiny is ascertained by the nature of that interest. A court must not be overquick to equate the scope of the right to protection or treatment for the involuntarily confined retarded with the already articulated scope of such rights for the criminally incarcerated.[11] Nor are analogies to state or common law precedents controlling it is federal law that answers the question of what process is due under the Constitution.[12]
 
 
 13
 The confinement of an individual to an institution for either the mentally ill or mentally retarded entails a "massive curtailment of liberty." Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). In consequence it is circumscribed by due process protections. Addington v. Texas, 441 U.S. 418, at 425, 99 S.Ct., at 1809. And once inside the institution an individual's liberty interest is not summarily extinguished.[13] Rather, those aspects of personal autonomy recognized from the time of Blackstone the power of locomotion without restraint and the right to personal security[14] as well as the right to freedom from punishment, require continued respect. These fundamental liberties may be legitimately encroached upon only when justified by an overriding,[15] non-punitive state interest related to the reasons for confinement.
 
 
 14
 Courts have reached a general consensus on three legitimate state justifications for the confinement of the mentally ill and mentally retarded. These rationales have evolved historically from (1) the protection of society from individuals who constitute a danger, a concept rooted in the state's police power; to (2) the protection of individuals unable to care for themselves or prone to self-destructive acts, based on police power and parens patriae rationales; and finally to (3) rehabilitation often limited to habilitation in the case of the mentally retarded also an exercise of the state's parens patriae authority.[16] See Addington v. Texas, 441 U.S. 418, at 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, O'Connor v. Donaldson, 422 U.S. 563, 573-74, 95 S.Ct. 2486, 2493-94, 45 L.Ed.2d 396 (1974).
 
 
 15
 Noticeably lacking, and logically inapplicable to the mentally retarded, are the traditional deterrence and retribution underpinnings of the criminal system.[17] Obviously, the state has no right to punish an innocent individual, and the concept of deterrence has a minimal effect on a severely retarded person, such as the plaintiff here. In seeking to explain claimed infringements of fundamental liberty interests, the state is limited to protection and treatment rationales of a compelling or substantial nature. Involuntary commitment in the civil context, then, quite clearly implicates a constitutional right to treatment and protection.[18] Alternatively, if a claimed post-commitment abridgement does not reach the status of a gross deprivation or squarely cut across constitutionally protected liberty interests, but only tangentially implicates such an important interest, a mutual accommodation between institutional objectives and constitutional provisions is needed. This is so since the very nature of an institution requires some limitation on the retained rights of those who are confined. Cf. Wolff v. McDonnell, 418 U.S. at 556, 94 S.Ct. at 2974. In such instances, security concerns, fiscal constraints and administrative necessities may be adduced to demonstrate that a claimed encroachment is necessary to a facility's internal operations.[19]
 
 III.
 
 16
 In the present case, Romeo's complaints may be appropriately conceptualized as (1) a right to be free from undue bodily restraint; (2) a right to personal security and protection; and (3) a right to adequate treatment. The first two are undiluted legal concerns, relating to protected liberty interests; as such, they are entitled to heightened judicial scrutiny. The third entails mixed questions of law and medical judgment, and thus requires a more flexible standard of judicial review and suitable deference to informed medical opinion.
 
 
 17
 The basis of Romeo's first claim, that he was unduly shackled,[20] is clearly inimical to the right of an unconvicted citizen to be free from punishment.[21] Even though shackling may not be punishment per se, it raises a presumption of a punitive sanction.[22] It squarely collides with a traditional liberty interest in freedom from bodily restraint.[23] A valid involuntary commitment ex necessitate extinguishes a retarded person's right to freedom from confinement. Nevertheless, a residuum of liberty remains which is entitled to due process protection. In Vitek v. Jones, which dealt with the transfer of a prisoner from a prison to a mental hospital, the Supreme Court found that an involuntary commitment to a mental hospital is "qualitatively different from the punishment characteristically suffered by a person convicted of crime." 445 U.S. 480, 499, 100 S.Ct. 1254, 1266, 63 L.Ed.2d 552 (March 25, 1980). Despite pre-existing confinement, a substantial, additional loss of liberty occurred, for which the Court required observance of due process safeguards. Similarly, in the situation before us, shackling is not normally within the range of conditions of confinement contemplated in habilitative institutionalization.[24] Neither in Vitek nor in the case at hand do the asserted privations inhere in the original rationales for confinement. Because of the fundamental right at issue here, as well as the substantial risk of error[25] and the possibility of significant harm, the proper judicial posture is one of careful scrutiny.[26]
 
 
 18
 Plaintiff requested that his shackling claim be analyzed under the rubric of a "right to treatment under the least restrictive conditions consistent with the purpose of the commitment." In this regard, he submitted the following charge:
 
 
 19
 Plaintiff contends that he was shackled to his bed or chair for long periods of time each day after he filed this lawsuit. If you find that he could have been provided treatment under less restrictive conditions than those imposed on him, then you must find that his constitutional rights were violated.
 
 
 20
 The court, however, gave the following instruction:
 
 
 21
 In order to prove his case the plaintiff must show acts or omissions sufficiently harmful to evidence a deliberate indifference to the serious medical needs of the resident. It is only such indifference that can offend the standards of decency required by the 8th Amendment. App. 2-236a 2-237a.
 
 
 22
 We have already recorded our disapproval of the adoption of the Eighth Amendment standard in the mental retardation area. However, we cannot assent as the concurrence suggests, to an analysis which scrutinizes shackling and a right to treatment by a standard that is essentially the same. The Pennsylvania statute generally prohibits such shackling practices, see fn. 21, and similarly, mental retardation professionals have relegated the use of physical restraints to the closets of an earlier age. Logically, Romeo's shackling claim centers on a liberty interest: a right to be free from bodily restraint.
 
 
 23
 The trial judge, therefore, should instruct the jury that such shackling may be justified only by a compelling necessity, i. e., that the shackling was essential to protect the patient or to treat him. It should be explained that, except in emergency situations, inadequate resources or administrative rationales offer an insufficient basis for intrusions of this kind on a fundamental liberty interest. As the courts have repeatedly proclaimed, "Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations." Jackson v. Bishop, 404 F.2d 571, 580 (8th Cir. 1968) (Blackmun, J.), quoted in Rozecki v. Gaughan, 459 F.2d 6, 8 (1st Cir. 1972) quoted in Wyatt v. Aderholt, 503 F.2d 1305, 1315 (5th Cir. 1974). Plaintiff is also entitled to a charge, in the alternative, that to absolve the defendants from liability on the shackling claim it would be necessary to find that shackling was the least restrictive method of dealing with the patient,[27] in light of his problems and the surrounding environment. A "least restrictive" charge will not only insure that compelling treatment explanations, as opposed to fiscal concerns or staff convenience, were the basis for the shackling, but also that the institution considered and rejected alternative methods of restraining the resident, if some restraint indeed was required.[28]
 
 
 24
 A comparison with the result that might be obtained by employing the unitary standard proposed by the concurrence is apposite here. Under the standard advanced by the concurrence, the jury would be charged that shackling is permissible so long as there was not "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the defendants did not base their conduct on a professional judgment." Arguably, such an instruction assumes that physical restraint for the convenience of the staff would constitute a substantial departure from accepted professional judgment. Yet it is not logically evident that concerns of staff convenience are the sort of departures from medical judgment that rise to the level of being a sham or otherwise illegitimate, as defined in the concurring opinion. More fundamentally, although the standard proposed by the concurrence would probably prevent use of shackling as punishment,[29] it would not preclude its use as a substitute for more effective treatment programs. Thus such a standard would fail to give adequate weight to the resident's substantial interest in freedom from bodily restraint. In addition, it would conflict with the thrust of the state's interest as proclaimed in § 4422 of the Mental Health and Mental Retardation Act, in prohibiting the use of mechanical restraints except in limited situations.
 
 
 25
 Our holding that the district court erred with respect to the jury instruction for the shackling claim, and our establishment of a compelling necessity standard for review of such troubling interferences with bodily freedom, necessarily require an additional finding of error in the district court's exclusion of relevant expert testimony. Under the compelling necessity or least restrictive standards of proof, both sides are, of course, permitted to adduce evidence. Although defendants must justify the shackling as the least restrictive means of handling or protecting the individual, the plaintiff may produce evidence, for example, that restraints were utilized largely because of convenience to the staff. Consequently, Dr. Foxx's proffered testimony regarding the inappropriate reasons and counterproductive results connected with the restraint of Romeo, was improperly excluded by the trial court.
 
 IV.
 
 26
 From Colonial times to the present day, the concept of liberty has embraced the "right to be free from and to obtain judicial relief for unjustified intrusions on personal security." Ingraham v. Wright, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). Plaintiff's second claim, the right to protection from attack, undeniably falls within the compass of this right. The record discloses that while confined at Pennhurst Romeo was injured on over seventy occasions. Some of these injuries were self-inflicted, some resulted from attacks by fellow residents, and some may even have been by the staff. The evidence also suggests that the defendants knew, or had reason to know, of some or all of the injuries suffered by the plaintiff. It would be anomalous to find that the right to a secure environment, which federal courts have often intervened to protect in the context of penal institutions, did not extend to facilities for the mentally retarded.[30]
 
 
 27
 The scope and nature of the right of the plaintiff to protection from attack is also capable of judicial demarcation. Both the individual's right to personal security and the state's interest in providing care converge to support a right to protection from attack. The state cannot simply confine a person, without more, because he may be a danger to himself or to third parties.[31] Only after the commission of a discrete criminal act and conviction in accordance with procedural protections is incarceration without more warranted. Consequently, in order to survive constitutional scrutiny, involuntary commitment of a mentally retarded person must combine an interest in insulating society from dangerous behavior with a promise, either express or by implication, to care for and to treat the individual.[32] Alternatively, the commitment of a retarded person for treatment purposes or because he is unable to care for himself, necessarily entails the provision of care and protection. The parens patriae power to provide care and protection is thus inextricably bound up in the involuntary commitment of the retarded regardless of the original rationale for the confinement.
 
 
 28
 Further, in Romeo's case, commitment was pursuant to Penn.Stat.Ann. tit. 50, Mental Health and Mental Retardation Act of 1966. The state, in confining Romeo, represented that it was "willing and able" to care for him.[33] The statute provides an entitlement to protection[34] which, like other state-created entitlements, is guarded by constitutionally acceptable procedures. The right to protection is not activated by an isolated mishap, or called into question by each bruise that a patient may suffer. But a pattern of attacks, injuries or violent behavior such as we have here would create a claim to such a right. While no one is guaranteed an injury-proof life, Romeo, as an involuntarily committed resident of Pennhurst, had a right to humane care and protection, bottomed both on the Pennsylvania statute and the Constitution.
 
 
 29
 Institutions for the mentally retarded are rarely "open" facilities. Those involuntarily confined are not free to return home, and indeed, many are bereft of any support by family and friends.[35] This absence of openness or significant community surveillance and oversight underscores the need for the courts to discharge their traditional function of safeguarding constitutional rights.[36]
 
 
 30
 Therefore, with respect to the protection claim, we conclude that the trial court erred in its charge. It instructed the jury that:
 
 
 31
 Under the 14th ... Amendment, state officials at a state mental hospital have a duty to protect involuntarily committed residents from repeated attacks by other patients and staff.
 
 
 32
 Plaintiff ... contends that these defendants violated such a duty to protect him because they were aware of such attacks and failed to take such reasonable steps as (were) required to protect him.
 
 
 33
 If you find that the defendants were deliberately indifferent to the medical and psychological needs of (the plaintiff), then you may find that plaintiff's ... 14th Amendment rights were violated.
 
 
 34
 To find for the plaintiff you need not find that the defendants personally participated in any attack upon the plaintiff. If you find that the defendants were aware of repeated attacks upon plaintiff and failed within their sphere of authority to take reasonable steps to protect the plaintiff, then you may find that the defendants are liable for a violation of the plaintiff's constitutional rights. (emphasis supplied)
 
 
 35
 As we see it, the jury should be informed that the plaintiff has a right to have his physical safety protected. The plaintiff sought an instruction that defendants had an obligation to "take reasonable steps to protect plaintiff." Chief Judge Seitz maintains that such a charge is virtually indistinguishable from a state malpractice standard. Infra at 177. However, analysis of this particular claim for constitutional purposes would proceed as follows: because this is a fundamental interest which conflates plaintiff's right to personal security with defendants' duty to protect if the defendants failed to provide for Romeo's personal security, such failure can be justified, in a § 1983 case, only by substantial necessity. Substantial necessity is more appropriate than the compelling necessity standard employed in connection with the shackling claim, for it enables a court and jury to distinguish between isolated incidents and inadvertent accidents, on the one hand, and persistent disregard of patients' needs, on the other.[37] If the defendants disregarded plaintiff's injuries or failed to take steps to protect plaintiff then they should be liable unless they can offer explanations based on important state interests.[38] However, the least restrictive charge, which is applicable to the shackling claim, is a less meaningful analytic tool in the protection setting because of the very existence of a right to personal security and a duty on the part of the state to protect. We cannot assume that all patients desire and are capable of dealing with the freedoms provided by least restrictive treatment. Moreover, inherent inconsistencies arise in the use of such a concept in the protection area. The least restrictive treatment, which might be the least confining, might provide insufficient protection and care for a particular resident's wants and needs.
 
 
 36
 In view of the stance we have adopted regarding the plaintiff's right to personal security and protection from attack, we hold that it was error for the district court to exclude the testimony of Dr. Foxx and Dr. Grover concerning the availability of treatment programs which would minimize the aggressive behavior and attacks that were unnecessarily prevalent at Pennhurst. Such evidence is relevant in enabling the jury to resolve whether the defendants were properly attending to, or overlooking, the right of the plaintiff to protection from attack.[39]
 
 V.
 
 37
 Plaintiff's third complaint turns essentially on a claim of inadequate treatment and a right to treatment in the least restrictive manner. As previously observed, unlike a right to freedom from bodily restraint or to personal security, treatment does not present a purely legal issue. See p. 159 supra. Questions of a court's relative competence concerning medical decisions and respect for medical judgment, as well as concerns of comity with the legislative and executive branches, place this claim in a different perspective. The move from preventing degrading impositions on human dignity, such as shackling and exposing a resident to continuous attacks, to requiring treatment consonant with individual needs, transfers the court to a subjective realm of decision making. Nevertheless, appropriate deference to medical expertise does not diminish the judicial duty to safeguard liberty interests implicated in treatment decisions.
 
 
 38
 The right to treatment or habilitation in the case of the mentally retarded[40] arises when an individual is involuntarily committed, regardless of whether parens patriae or police power grounds provide the major premise for the confinement. See pp. 158, 162 supra. A court performs two functions with respect to such a right: it requires that treatment be provided to those who require and are willing to accept it, and it places limits on the state's power to impose such treatment on those who do not desire it. A right to treatment does not create a corresponding duty to submit to any treatment whatsoever; such a simple equation would sanction unacceptable invasions of personal autonomy.[41]
 
 
 39
 At one end of the spectrum, an absolute failure to treat, when treatment is the reason for commitment, raises clear and serious constitutional problems. As the Court noted in O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1974), "where 'treatment' is the sole asserted ground for depriving a person of liberty, it is plainly unacceptable to suggest that courts are powerless to determine whether the asserted ground is present." Id. at 574 n.10, 95 S.Ct. at 2493 n.10. In such instances, it is the court's duty to insist on appropriate treatment or that the plaintiff be released.[42] At the other end of the spectrum is the judicial role in dealing with involuntary treatment which occasions severe intrusions on individual dignity. Nonreversible physical operations, such as a vasectomy, or permanent physical alterations by surgical intervention, such as a prefrontal lobotomy, or the administration of powerful antipsychotic drugs may well constitute fundamental liberty violations.[43] Like shackling, it may be that they should be subject to close court scrutiny.[44] Similarly, the reasons which commend the use of least restrictive analysis with respect to shackling existence of a judicially assessable, discrete act, which entails a significant loss of individual liberty may be present in the context of such invasive, involuntary procedures. Since some of these procedures may not be present in the case at hand after it is remanded, we do not address the subject in any detail except to note the possibility of its existence. But, whenever unalterable interferences with bodily integrity place deprivations of liberty in issue, the law and not medicine is the ultimate decision-maker.
 
 
 40
 Once analysis transcends the groundlevel question of treatment vel non, however, and settles in the middle ground, legal questions of unconstitutional liberty deprivations begin to merge with medical judgments regarding the appropriateness of the regimen. Inasmuch as we are remanding, inter alia, because the district court's improper employment of Eighth Amendment scrutiny resulted in the exclusion of the plaintiff's proffered medical testimony, it is uncertain how the record will develop at trial. However the summaries of medical testimony, offered as proof out of the hearing of the jury, suggest that the trial court may need guidance in a range of situations, involving problems of both intrusive and inadequate treatment. We therefore find it in order to delineate the legal standards and jury charges applicable in the treatment realm.
 
 
 41
 Where the issue turns on which of two or more major treatment approaches is to be adopted, a "least intrusive" analysis may well be appropriate. If the staff decides upon a course of treatment which offers some promise of effectiveness without undue risk to the patient, such decision may well come within the ambit of least intrusive means. If the likelihood of serious side effects does exist, however, and substantial improvement is not reasonably expectable, then such judgments might well present a basis for finding that the course of treatment was not the least intrusive under the circumstances.[45] In making constitutional judgments in such situations, the court must necessarily depend in large measure on medical evidence. Once the least intrusive regime has been selected, therefore, the application of a constitutional standard of "least intrusive alternative" to continuing treatment programs, which often involve qualitative medical determinations subject to daily, possibly hourly changes, would prove unworkable.[46] The judiciary is not in a particularly advantageous position to determine which of two medications is less intrusive, nor especially competent in assessing present therapeutic benefits versus long-term consequences and side effects for each administration of a drug. Further, least restrictive assumes a direct correlation between restrictiveness and effectiveness, a presumption which can not be medically corroborated in every instance.[47]
 
 
 42
 Unfortunately, in attempting to craft the appropriate standard to apply to a charge of inadequacy of treatment the courts find themselves in a Scylla and Charybdis situation. On the one hand, the Supreme Court has cautioned that,
 
 
 43
 Although we acknowledge the fallibility of medical and psychiatric diagnosis, (citation omitted) we do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative hearing officer.... the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real.
 
 
 44
 Parham v. J.R., 442 U.S. 584, 609, 99 S.Ct. 2493, (1979). On the other hand, the Supreme Court has noted that "The medical nature of the inquiry, however, does not justify dispensing with due process requirements." Vitek v. Jones, 445 U.S. 480, 499, 100 S.Ct. 1254, 1266, 63 L.Ed.2d 552 (March 25, 1980), citing Addington v. Texas, 441 U.S. at 430, 99 S.Ct. at 1811. Although both these statements refer to initial commitment procedures for the mentally ill,[48] their logic appears equally applicable to judicial review of treatment decisions within institutions for the mentally retarded.
 
 
 45
 In the present case Romeo was confined pursuant to § 406 of the Pennsylvania Mental Health & Mental Retardation Act of 1966, which provides that commitment is for "care and treatment."[49] By basing Romeo's deprivation of liberty at least partially upon a promise of treatment, the state ineluctably has committed the community's resources to providing minimal treatment. While Romeo has an entitlement to some treatment,[50] the evidence in the record, although somewhat contradictory, suggests not so much a total failure to treat as an inadequacy of treatment.[51]
 
 
 46
 Given this situation it would be unrealistic for us to ignore that courts by and large are not in as advantageous a position as the personnel at applicable institutions to make decisions relating to day-to-day or hour-to-hour treatment.[52] Moreover, the evaluation of standards of adequacy and suitability in the psychiatric field is extremely difficult even for trained personnel, and certainly in the judicial context. Questions in this field, as the Court in Addington noted, often require not only a resolution of complicated factual issues, they turn on the very meaning of those facts a meaning that must be interpreted by expert psychiatrists and psychologists. 441 U.S. at 429, 99 S.Ct. at 1811.[53] And unquestionably, the gap between available resources and those needed for ideal treatment programs is, unfortunately, considerable. Once minimum treatment needs are satisfied, courts should be cautious in requiring legislatures to allocate resources in a way that may well be more desirable, but not constitutionally mandated.[54]
 
 
 47
 Consequently, with respect to the claim regarding adequacy of treatment, we agree neither with the plaintiff, that he has a right, insofar as day-to-day decisions are concerned, to judicial review based on a constitutional standard of least intrusive,[55] nor with the defendants that only deliberate indifference to the medical and psychological needs of Romeo constituted a violation of his right to treatment.[56] It should be made clear to the jury that for the plaintiff to prevail it is necessary to find that an individual involuntarily confined in a facility for the mentally retarded did not receive a form of treatment that is regarded as acceptable for him in light of present medical or other scientific knowledge.[57] The state should be permitted to adduce evidence of security concerns, administrative necessities and fiscal constraints in the course of explaining its adoption of the challenged program. Thus, if defendants can demonstrate a coherent relationship between a particular treatment program and a resident's needs, they would not be liable.[58]
 
 
 48
 The standard articulated here may appear, at first blush, to differ minimally from that propounded by the concurrence. However, the concurring opinion's concern with distinguishing the constitutional prohibition against a "substantial departure from accepted professional judgment" from a malpractice standard might lead to an approval of all conduct that is "not a sham or otherwise illegitimate." Infra at 181. We do not believe that such a test can adequately protect a retarded person's acknowledged constitutional right to treatment or habilitation.[59] Nor do we believe that the judiciary lacks the tools to ascertain whether the constitutional minimum of medical acceptability proposed here is being fulfilled. While earlier courts struggled to weigh conflicting opinions and contending medical theories regarding severely retarded persons, Congress has recently facilitated a court's ability to determine whether a coherent relationship between a treatment program and a resident's needs exists. The enactment of the Developmentally Disabled Assistance and Bill of Rights Act of 1975 provides guidelines, albeit not constitutionally binding, which enhance rational court review.
 
 
 49
 Should the plaintiff's constitutional claims fail, the recent case of State of Maine, et al. v. Thiboutot, 448 U.S. 1, 12, 100 S.Ct. 2502, 2508, 65 L.Ed.2d 555 (1980), may provide a remedy under 42 U.S.C. § 1983 for statutory claims grounded in the Developmentally Disabled Assistance and Bill of Rights Act. The potential availability of such a route for redressing infringements or deprivations of rights established by federal statutes further suggests that we are dealing not with matters of common law malpractice, but with fundamental interests of national import.
 
 VII.
 
 50
 Although the varying standards set forth in this opinion may occasion concern that the issues presented to the jury might appear overly complex, we believe they are meaningful and carefully distinguish varying factual situations. It cannot be gainsaid that the act of shackling a resident is substantially different from the implementation of daily treatment decisions. Likewise, a failure to protect an individual from a sustained series of attacks cannot properly be equated with a failure to choose a particular technique for habilitation. Accordingly, special effort should be employed to ensure that juries can intelligently grasp the differences. Such an effort is not completely novel in the law. It takes place, for example, in areas of negligence law, immunity law, and admiralty law. We do not, therefore, share the concern expressed by the concurring opinion that district court judges or juries will be unable to understand these distinctions. Moreover, it is reasonable to expect that future plaintiffs will have grounds for raising only one or two of the claims analyzed here, thus further simplifying the difficult task. In any event, it would be a disservice to an injured person who claims to have been abused during a period of involuntary institutionalization to lump indiscriminately a variety of constitutional violations for the sake of beguiling simplicity. Such oversimplification, so handy in political debate, often lacks the precision necessary for resolving complicated legal questions.
 
 
 51
 Inasmuch as it is still unclear how the evidence will emerge at the retrial, we have set forth in an appendix what may provide a beginning point for a set of jury instructions in a matter of this type.[60] Of course the specific instructions submitted to the jury must be carefully structured to reflect the actual record that is developed on remand.
 
 VIII.
 
 52
 Because we have already ruled that a new trial is required, we need not decide whether the other errors raised by plaintiff concerning the method in which the trial was conducted are themselves grounds for a new trial. However, we believe that a comment on the trial court's approval of dual representation for the defendants is in order. At a final pretrial conference, the attorney who had appeared for all the defendants, as a result of an insurance agreement, requested that both he and the deputy attorney general, who represented the defendants as state employees, be permitted to act as counsel during trial. The district court ruled in favor of this joint participation. In order to explain the presence of both attorneys, the court suggested that insurance counsel identify himself as the attorney for Dr. Youngberg, and that the deputy attorney general identify himself as counsel for defendants Matthew and Conley. The jury was so advised, and heard two sets of opening and closing statements, as well as double cross-examinations, although no separate legal interests or conflicts among defendants were asserted or surfaced.
 
 
 53
 On remand, the district court should make some ruling on this issue. If it determines that dual representation is permissible, it should set forth supporting reasons.[61] Moreover, the practice of permitting counsel to make deliberate misstatements to the jury, even for the purpose of concealing the existence of liability insurance coverage, is of dubious propriety and should not be repeated.
 
 IX.
 
 54
 In order to appreciate the full problem posed by this case, it is important to note that the Supreme Court has recognized a common law of qualified immunity protecting officials and employees from civil liability for acts performed in the discharge of duties imposed upon them. Such immunity is available even when constitutional rights have been transgressed, if the official or employee was not aware, or had no reason to be aware, of such rights. As the Supreme Court explained in Wood v. Strickland, liability for damages for every action which is found subsequently to have been violative of a person's constitutional rights and to have caused injury would unfairly impose upon administrators the burden of mistakes made in good faith in the course of exercising discretion within the scope of official duties. 420 U.S. 308 at 319, 95 S.Ct. 992 at 999, 43 L.Ed.2d 214 (1975).
 
 
 55
 Because of the evolving nature of the rights in issue here, it may well be that the defendants did not know of them or had no reason to know of them governmental officials are not "charged with predicting the future course of constitutional law." Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). Institutional administrators are entitled to rely on traditional sources for the factual information incorporated in their policy decisions, and when faced with behavior causing or threatening disruption, have an obvious need for prompt action and judgments, which can only be based on existing knowledge. See Scheuer v. Rhodes, 416 U.S. 232, 246, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974). Accordingly, when this matter is remanded for a new trial, the trial judge should instruct the jury regarding the possibility of immunity[62] with the caveat that defendants' reasonable belief is to be judged at the time their actions were taken. The jury should further be charged that the defendants are not responsible for unforeseeable developments in the law.
 
 X.
 
 56
 The deplorable conditions at Pennhurst and the manifold problems and anguish that those conditions spawned have been addressed in Halderman v. Pennhurst. The present litigation deals with the more discrete problems facing individual patients and their relationships with officials and employees of the institution. More particularly, it relates to the constitutional rights possessed by such citizens and the responsibilities and duties of officials and employees who are claimed to violate such rights.
 
 
 57
 Unfortunately, these constitutional rights have not always been clearly perceived, and even when recognized the description of such rights, their articulation, and their application to particular factual patterns has only slowly emerged. Even today, the process is still in its early stages.
 
 
 58
 The difficulty of the task and it frequently is difficult to describe with exactitude the contours of developing constitutional protections is further complicated because the applicable medical disciplines are themselves still in their formative period, and because the resources available to the states are so limited. Nonetheless, where valid rights of citizens are at stake, the courts may not shirk the task of seeking to spell out the elements and details of such rights as carefully as possible.
 
 
 59
 To the extent that in the past we may have invoked inapplicable analogies, we should be forthright enough to admit the error and to seek to rectify it. To the extent that utilization of other concepts, though appealing, is found to be impractical, we should continue the quest for standards that are realistic and reflective of the changes that are still taking place in psychiatry, psychology, sociology and other related fields that so greatly affect the problems of the retarded.
 
 
 60
 At the same time we must be cautious in establishing rules that would visit serious financial liabilities on administrators, who, when they performed the acts in question, were not aware of the new standards of rights and responsibilities subsequently formulated by the courts or the new scientific advances that have been achieved to minister to persons who are mentally retarded.
 
 XI.
 
 61
 The judgment of the district court will be vacated, and the case remanded for a new trial.
 
 APPENDIX
 I. SHACKLING
 
 62
 If you find that the plaintiff was shackled against his will, and defendants knew or had reason to know of such conduct, you may find the defendants liable unless they can offer compelling reasons for this action. If the defendants satisfactorily explain that it was necessary to shackle the plaintiff for his own protection or for treatment purposes, then they may not be liable. However, it must be demonstrated that the shackling was the least restrictive means of handling the resident that other, less severe measures had been tried or considered and found unworkable. Only compelling reasons relating to the treatment or the protection of the resident are permissible justifications for shackling.II. PROTECTION FROM ATTACKS
 
 
 63
 If you find that the plaintiff was harmed by a series of attacks, and the defendants knew or had reason to know of them, then you may hold the defendants liable. If the defendants knew or had reason to know of these attacks, then only if they provide substantial reasons which explain that the attacks occurred despite their attention will they be deemed to have fulfilled their duty to care for and to protect the plaintiff. Substantial explanations have to do with promoting the treatment or protection of the plaintiff. For example, if the staff considered it important, for therapeutic purposes, to have the resident mingling with others instead of confined to an isolated cell, even though some risk of injury existed, you may consider that to be a substantial explanation. But overcrowded conditions or inadequate staffing patterns may not justify the injuries.
 
 III. ADEQUATE TREATMENT
 
 64
 A. If you find that the plaintiff was involuntarily committed for treatment, and no treatment was administered, and no compelling explanation for the lack of treatment was offered, you may hold the defendants liable.
 
 
 65
 B. If you find that the plaintiff has received some treatment, you must then determine whether the treatment is regarded as acceptable in the light of present medical or other scientific knowledge. If you find that it is not acceptable, you may find for the plaintiff. In addition, if the evidence does not demonstrate that there is a relationship between the treatment administered and the plaintiff's needs, even if the treatment is arguably regarded as acceptable in other situations, then you may find for the plaintiff. In deciding upon the adequacy of the treatment program adopted you may consider the defendants' explanations regarding security concerns, administrative necessities and fiscal constraints.
 
 
 66
 C. If you find that a selection of a mode of treatment subjected the plaintiff to significant deprivations of liberty, then you must go on and determine whether that decision provided for the least intrusive treatment available under the circumstances. If the defendants considered other alternatives and ascertained that the program adopted was the least intrusive available, then you should find the defendants not liable.
 
 
 67
 SEITZ, Chief Judge, concurring, with whom Judges ALDISERT, ROSENN, and GARTH join.
 
 
 68
 I agree with the majority that the judgment of the district court must be vacated and the case remanded for a new trial because of the exclusion of relevant expert testimony and the use of improper legal standards in the charge to the jury. I also agree with the majority that this case is governed by the due process clause of the fourteenth amendment and not by the eighth amendment. I write separately because of a pervasive disagreement with the majority with regard to the standards that should be employed in charging the jury on remand.[1]
 
 I.
 
 69
 Pennhurst is not unfamiliar to this court. Halderman v. Pennhurst State School & Hospital, 612 F.2d 84 (3d Cir. 1979) (in banc), cert. granted, 447 U.S. 904, 100 S.Ct. 2984, 64 L.Ed.2d 853 (1980), was a class action on behalf of the residents of Pennhurst challenging the practice of institutionalizing the mentally retarded. Plaintiff Nicholas Romeo is a member of that class, and the defendants here are also defendants in Halderman. A majority of this court held in Halderman that federal and state statutory provisions granted the residents of Pennhurst a right to treatment in the least restrictive environment. See 612 F.2d at 104-07; Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6001-6081 (1976); Mental Health & Mental Retardation Act of 1966, Pa.Stat.Ann. tit. 50, §§ 4101-4704 (Purdon 1969). The court remanded for an individualized determination of what type of environment, institutional or otherwise, best suited each class member's needs. The majority did not have to reach the constitutional issues presented by the plaintiffs.
 
 
 70
 This suit presents legal issues that take the next step beyond Halderman. The plaintiff alleges that while confined at Pennhurst he was deprived of his rights under the eighth and fourteenth amendments of the Constitution.[2] The defendants are state officials who had policymaking and supervisory responsibilities at Pennhurst when the alleged constitutional violations occurred. They are charged by the plaintiff with failing to adopt policies and procedures that would protect the plaintiff from attacks by other residents and staff. The plaintiff also claims that the defendants violated his constitutional rights after his transfer to the Pennhurst hospital building by causing him to be physically restrained for long periods of time and by refusing to provide adequate treatment. The violations after the plaintiff's transfer to the hospital building were allegedly to punish him for filing this suit. Although the theory of the plaintiff's complaint is not entirely clear, the defendants are apparently charged with direct liability rather than vicarious liability for the conduct of other state employees supervised by them. The plaintiff's complaint requested injunctive relief as well as damages against the defendants in their official and individual capacities, but only the damage claims against the defendants in their individual capacities are raised on this appeal.
 
 II.
 
 71
 The majority establishes a multilevel series of standards to govern the plaintiff's claims. First, with respect to the protection claim, the majority holds that failure of the defendants to provide for the plaintiff's safety can be justified only by a showing of substantial necessity. Second, because physical restraint "raises a presumption of a punitive sanction," it can be justified only by a compelling necessity. In addition, the majority holds that the plaintiff is entitled to an instruction that the defendants must show that restraint was the "least restrictive method of dealing with the patient, in light of his problems and the surrounding environment." Third, the majority divides the treatment claim into three categories. If the jury finds that no treatment was administered, it may hold the defendants liable unless they can provide a compelling explanation for the lack of treatment. If some treatment was administered, the defendants will not be liable if that treatment was "acceptable in light of present medical or other scientific knowledge.... Thus, if defendants can demonstrate a coherent relationship between a particular treatment program and a resident's needs, they would not be liable." Finally, "least intrusive" analysis applies to the selection of a treatment approach if the jury finds that the approach subjected the plaintiff to "significant deprivations of liberty."
 
 
 72
 These standards are unnecessarily complex, and they undoubtedly will cause confusion. This complexity and confusion will affect both the ability of a jury to meaningfully assess liability and the ability of state officials like the defendants to effectively conform their conduct to these standards. The jury will be forced to make artificial distinctions between what are in reality related issues. Moreover, the jury must give essentially similar standards the distinctive meanings envisioned by the majority. For example, even if the jury can meaningfully differentiate between compelling necessity and substantial necessity, it is unlikely that it can do so in the manner contemplated by the majority, i. e., as a way "to distinguish between isolated incidents and inadvertent accidents, on the one hand, and persistent disregard of patients' needs, on the other."
 
 
 73
 The majority's multilevel standards also will inject complexity and confusion into the work of state officials who, like the defendants, have policymaking and supervisory responsibilities at institutions like Pennhurst. These officials will have to formulate policies and procedures to ensure that the institution's residents are (a) protected from attack unless some substantial necessity justifies the lack of protection, (b) left unrestrained unless some compelling necessity justifies their restraint, and (c) treated with various methods that may, depending on the circumstances, have to be based on accepted medical or other scientific knowledge or be the least intrusive treatment available.
 
 
 74
 Furthermore, in the unlikely event that state officials are able to formulate appropriate policies and procedures under the different standards, they still may be uncertain as to what standards govern their conduct. Treatment programs, for example, could be governed by more than one standard. Testimony at the trial indicated that some behavior modification programs utilize "timeout" principles involving periodic mechanical restraint of the limbs to eliminate aggressive behavior. It is not clear whether such a program has to be the least intrusive alternative or only be acceptable in light of present medical or other scientific knowledge.
 
 
 75
 This complexity and confusion is unnecessary. In some situations the development of multilevel standards may be unavoidable. I do not believe, however, that such standards are required in this case to accurately differentiate the factual and legal issues presented. As will be noted below, the plaintiff's claims are interrelated, and it is unrealistic to treat them as discrete questions. Protection, restraint, and treatment are not severable issues in the context of the institutionalized mentally retarded. I believe that a single standard can be established to protect the constitutional rights of committed persons while recognizing the legitimate interests of the state.
 
 III.
 
 76
 It is important to examine the relevant constitutional principles before formulating a standard to govern the issues presented in this case. Initially, I agree that conditions of confinement of the mentally retarded are subject to due process scrutiny. Government action that infringes liberty interests is subject to scrutiny under the due process clause and, at a minimum, it must be supported by a legitimate state interest. A mentally retarded person does not lose this protection merely because he is institutionalized.
 
 
 77
 This is not the end of the matter, however. Institutionalization by definition entails some restrictions on the personal liberty of committed individuals. As I noted in Halderman, I believe that "the state's willingness to provide the residents with such necessities as food, shelter, medical care, and supervision, for which the residents have no other source, forms an adequate basis for some state-imposed restrictions on their liberty." 612 F.2d at 125 (Seitz, C. J., dissenting). The questions that remain, of course, are the degree to which personal liberty can be infringed and the duties owed by the state to residents of its institutions.
 
 
 78
 The state may not confine a mentally retarded individual unless it has at least a legitimate purpose for doing so. Because the state can confine an individual only for certain purposes, the conditions of that confinement must bear a reasonable relationship to those purposes. As the majority notes, three state interests traditionally have been advanced to justify commitment of the mentally disabled: danger to others, danger to self, and the need for care or treatment. When analyzing these state interests it is tempting to speak of them as being analytically distinct. In reality, they represent a finely meshed interaction of state interests and patient needs. This is especially true in the context of postcommitment issues. For example, it is somewhat artificial to speak of danger to self as being distinct from the need for care or treatment. The very fact that an individual is dangerous to himself means that he needs care and treatment. Similarly, the need for a safe environment, which is raised by the plaintiff's protection claim, implicates all three interests. Some of the plaintiff's injuries are the result of retaliation by other patients for his attacks on them, and this retaliation has a double effect: it makes the plaintiff's environment physically unsafe and it tends to impede his maximum development. Although the three interests are not entirely coextensive, this interrelation must be kept in mind when employing legitimate state interest analysis.
 
 
 79
 With this view of state interests and patient needs in mind, I believe that the plaintiff has a constitutional right to minimally adequate care and treatment. The existence of a constitutional right to care and treatment is no longer a novel legal proposition. See, e. g., Donaldson v. O'Connor, 493 F.2d 507 (5th Cir. 1974), rev'd on other grounds and remanded, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); Rouse v. Cameron, 373 F.2d 451 (D.C.Cir.1966). Although the seminal right-to-treatment cases were concerned only with the mentally ill, recent cases have extended this right to the mentally retarded. See, e. g., Welsch v. Likins, 550 F.2d 1122 (8th Cir. 1977); Wyatt v. Aderholt, 503 F.2d 1305 (5th Cir. 1974).
 
 
 80
 It is important to remember, however, that insofar as a constitutional right to treatment is concerned, there are critical differences between the mentally ill and the mentally retarded. Cf. Kremens v. Bartley, 431 U.S. 119, 135-36, 97 S.Ct. 1709, 1718-19, 52 L.Ed.2d 184 (1977) (in defining appropriate class in rule 23 action challenging state commitment statute, court must pay careful attention to differences between mentally ill and mentally retarded). For example, this court noted in Halderman that "(s)trictly speaking, since mental retardation is not a curable disability, the term 'treatment' is inappropriate. Rather, 'habilitation,' which refers to 'that education, training and care required by retarded individuals to reach their maximum development'... is the more appropriate term." 612 F.2d at 95 n.14 (citation omitted). It is in this sense that I use the term "treatment" in this opinion. In addition, profoundly retarded persons such as the plaintiff are generally unable to provide themselves with food, shelter, and clothing as well as basic protection from other persons and physical hazards. Thus, the danger rationales justifying commitment of the mentally retarded are often quite different from those justifying commitment of the mentally ill.
 
 
 81
 The state does not contest that it has placed the plaintiff in Pennhurst to provide basic care and treatment. Indeed, he has a right to treatment under state law, see Halderman, 612 F.2d at 100-103, and the fact that Pennhurst has programs and staff to treat patients is indicative of such a purpose. I believe that when the purpose for confining a mentally retarded person is to provide care and treatment, as is undoubtedly the case here, it violates the due process clause to fail to fulfill that purpose. With the above considerations in mind, I will now examine the contours of the constitutional right to care and treatment in the context of each of the plaintiff's claims.
 
 IV.
 A. Protection Claim
 
 82
 The plaintiff's first claim is that the defendants violated his constitutional rights by not adopting policies and procedures that would protect him from attacks by other residents and Pennhurst employees. In its charge to the jury on this issue, the district court stated that the defendants could be held liable only if they were "deliberately indifferent to the medical and psychological needs of (the plaintiff)." The plaintiff argues that the district court erred in using this language. The phrase "deliberate indifference" derives from Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), in which the Supreme Court held that deliberate indifference to the serious medical needs of prisoners "constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Id. at 104, 97 S.Ct. at 291 (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, & Stevens, JJ.)). The question presented here is whether this eighth amendment standard is a correct statement of the duty imposed by the due process clause to care for and to treat the institutionalized mentally retarded.
 
 
 83
 The constitutional right to care and treatment means that the defendants must provide a "basically safe and humane living environment." Goodman v. Parwatikar, 570 F.2d 801, 804 (8th Cir. 1978). This duty includes reasonable protection from attacks by other residents and staff. At a minimum, the defendants have an affirmative obligation to discover the needs of mentally retarded patients for protection and to respond to those needs in an adequate manner. Because the deliberate indifference standard is not a proper method to implement these affirmative due process requirements, use of such language in the charge was reversible error.
 
 
 84
 The plaintiff contends that the correct legal standard is that the defendants must take reasonable steps to protect the plaintiff. This standard, however, is virtually indistinguishable from the standard that would apply in a state malpractice action. Some courts have analogized to common-law tort principles in adopting the standard of care for a section 1983 claim. See, e. g., Whirl v. Kern, 407 F.2d 781 (5th Cir.), cert. denied, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969). However, the Supreme Court has exhibited concern in an eighth amendment context about turning every state malpractice claim into a constitutional violation. See Estelle, 429 U.S. at 106, 97 S.Ct. at 292, ("deliberate indifference" standard used to distinguish constitutional violations from medical malpractice). Constitutionalization of state torts is equally a concern in due process analysis. See, e. g., Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); United States v. Delerme, 457 F.2d 156 (3d Cir. 1972). Adoption of the standard requested by the plaintiff would make section 1983 coextensive with malpractice claims when state action is present.
 
 
 85
 Distinguishing constitutional violations from ordinary malpractice claims is especially difficult in the present case because care and treatment often involve issues similar to those presented by malpractice actions. Nevertheless, I believe that this distinction should be maintained in order to confine the jury to constitutional deliberations. It is true that some malpractice claims may also rise to the level of a constitutional violation. This does not mean, however, that liability under section 1983 should be coextensive with liability in state malpractice actions. The fourteenth amendment was not intended to remedy every tort violation in which there is state involvement. Section 1983 itself places limitations on the constitutionalization of state tort claims by requiring that plaintiffs be deprived, under color of state law, of a right secured by the Constitution and laws of the United States. Strict adherence to these requirements prevents section 1983 from becoming a "font of tort law to be superimposed upon whatever systems may already be administered by the States." Paul v. Davis, 424 U.S. at 701, 96 S.Ct. at 1160.
 
 
 86
 Because federalism principles are implicated here, I believe that a further limitation is necessary. Under these circumstances I would hold that allegations of constitutional violations based only upon mere malpractice do not state a cause of action under section 1983. See Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1081 (3d Cir. 1976) (neglect, carelessness, or malpractice without more does not establish constitutional violation under § 1983); Harper v. Cserr, 544 F.2d 1121, 1124 (1st Cir. 1976) (section 1983 would not afford relief for complaint alleging negligence or malpractice). This construction of the statute implements the objectives of section 1983 without encroaching on interests that are only a matter of state concern. It must be remembered that with respect to the institutionalization of the developmentally disabled, the Constitution only establishes minimum standards below which the state's conduct may not fall. Although common-law tort principles may provide a useful starting point in formulating the appropriate standard of care under section 1983, they cannot be determinative of the constitutional issue.
 
 
 87
 In developing a standard to assess whether the defendants have infringed the plaintiff's constitutional right to care and treatment, it is also important to keep in mind the nature of the conduct that will be evaluated by the jury. The question of how best to treat the mentally retarded is a hotly debated subject among experts, and the answers most likely will change over time with the acquisition of new knowledge. Although the statutes in Halderman required us to enter the debate, I believe that such a debate should not be elevated to constitutional proportions. A statute is relatively easy to change but the Constitution is not. In my view, the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made. Cf. Developments in the Law Civil Commitment of the Mentally Ill, 87 Harv.L.Rev. 1190, 1342-44 (1974) (discussing use of an administrative law model to ensure that court does not engage in evaluating various psychiatric theories).
 
 
 88
 Although I have indicated that the care and treatment of the institutionalized mentally retarded must be left largely to the appropriate professionals, some judicial scrutiny is essential if the right to care and treatment is not to become meaningless. As I noted previously, the defendants must discover the needs of the institution's residents and, if action is necessary, respond adequately to those needs. Once the defendants have taken action, or have chosen not to act, it must be determined whether their conduct satisfies the Constitution.
 
 
 89
 I would hold that the jury should be instructed that the defendants are liable if their conduct was such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of this plaintiff as to demonstrate that the defendants did not base their conduct on a professional judgment. This is not a malpractice standard. By "accepted professional judgment" I do not mean some standard employed by a reasonable expert or a majority of experts in the community, as state malpractice actions would require, but rather that the choice in question was not a sham or otherwise illegitimate. The jury is to decide only whether the defendants' conduct had some basis in accepted professional opinion. Furthermore, unlike state malpractice actions, a departure from accepted professional judgment must be substantial to give rise to liability. Although violations of the standard that I have developed would probably contravene state malpractice standards as well, this does not mean that the two standards are coextensive. The "substantial departure from accepted professional judgment" standard effectively distinguishes between conduct that violates the minimum requirements of the Constitution and conduct, such as ordinary malpractice, that does not.
 
 
 90
 Instructions consistent with the previous paragraph properly balance the plaintiff's constitutional right to minimally adequate care and treatment against the legitimate interests of the state. Thus, with regard to the plaintiff's claim that the defendants failed to adopt policies and procedures that would adequately protect him from attacks by other residents and staff, the jury should be charged in accordance with the "substantial departure from accepted professional judgment" standard. The district court's charge is inconsistent with this standard, and it improperly excluded expert testimony relevant to the above inquiry.
 
 B. Restraint Claim
 
 91
 In his second claim, the plaintiff alleges that the defendants violated his constitutional rights by causing his freedom of movement to be restricted through the use of various mechanical restraints while he was confined in the Pennhurst hospital building.[3] The majority holds that the least restrictive alternative standard applies to this claim. I believe that this standard does not represent what the Constitution requires as a minimum for a number of reasons. In Halderman this court held that the residents of Pennhurst have a right to treatment in the least restrictive environment under the Developmentally Disabled Assistance and Bill of Rights Act and the Pennsylvania Mental Health & Mental Retardation Act of 1966. However, Halderman rested solely on statutory grounds and the present case involves the Constitution.[4] Furthermore, the least restrictive alternative standard is inappropriate here for a far more fundamental reason.
 
 
 92
 The major issue in Halderman was whether institutionalization was per se illegal. Although we referred to the living conditions at Pennhurst, the main issue in Halderman was where the members of the class should be treated. That question is not presented in this case. See note 2 supra. The only question here is whether, assuming institutionalization is legal, the actions taken within the institution satisfy the Constitution. Regardless of the validity of least restrictive alternative analysis in other facets of treatment of the mentally retarded, it simply has no applicability to conditions within an institution.
 
 
 93
 Implicit in the least restrictive alternative theory is the notion that the state's only interest in institutionalizing a person is treatment. See, e. g., Wyatt v. Aderholt, 503 F.2d 1305, 1313 (5th Cir. 1974) (state interests other than treatment are "trivial" compared to massive curtailment of liberty involved). But see Morales v. Turman, 562 F.2d 993, 998 (5th Cir.) (questioning this and other aspects of Wyatt), rev'd and remanded on other grounds, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977) (per curiam). I believe, however, that this gives inadequate recognition to the subtle interrelation of the various state interests involved.
 
 
 94
 As already noted, the three state interests normally associated with confinement of the developmentally disabled danger to others, danger to self, and need for care or treatment overlap and mesh together to some extent in this context. This is especially true as to actions taken within the institution, where decisions about proper care or treatment often must be made on a day-to-day basis. The least restrictive alternative test gives inadequate recognition to this fact. Because the state's interests are rather complex, a particular mode of care or treatment may serve one state interest but not another. For example, physical restraints may serve short-run safety needs but not long-run habilitation needs. By focusing on the "best" care or treatment through a rather rigid view of the state interests, least restrictive alternative analysis tends to obscure the true nature of the state interests. Because the standard to be applied must give recognition to the interplay of the various interests, I believe the majority's test is an inappropriate standard for constitutional purposes. In short, even if least restrictive alternative analysis provides an appropriate framework for answering the question of where to place the mentally retarded, it is simply too rigid a tool once we leave that question and focus on conditions of care and habilitation within a particular institution.
 
 
 95
 Moreover, the least restrictive alternative standard is not easily transferable from the context in which it originated to the situation presented by this case. The standard evolved from the less drastic means analysis formulated by the Supreme Court in cases involving free speech. See, e. g., Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Since its first exposition of the less drastic means doctrine, the Supreme Court has been rather cautious in using the doctrine because some less drastic alternative almost always exists. If used without caution, the doctrine could invalidate almost any state action. See generally Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 188-89, 99 S.Ct. 983, 992-93, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring); Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464, 472 (1969).
 
 
 96
 These difficulties can be avoided where there is one, objectively ascertainable less drastic means. See Richardson, Freedom of Expression and the Function of Courts, 65 Harv.L.Rev. 1, 40 (1951). This single, objective alternative simply does not exist in the care and treatment of the mentally retarded because what is the best care or treatment at any given time may be a subject of great professional debate. Thus, judges and juries likely will not be able to make a single, objective determination. Furthermore, because a mentally retarded individual's needs change over time, the least restrictive alternative standard will in effect require continuing evaluation of the "best" method, not a single determination. Although Congress or the states may adopt this standard as part of a statutory scheme, such difficulties caution against use of the doctrine as a constitutional matter. Thus I disagree with the majority's application of the least restrictive alternative standard to the plaintiff's restraint claim.
 
 
 97
 The "substantial departure from accepted professional judgment" standard that I developed in relation to the protection claim should also apply to the restraint claim. This standard provides for judicial scrutiny yet gives the state leeway in which to accommodate the interests it has in confining the mentally retarded. At first glance, this standard may appear to be inappropriate in the context of a restraint claim. As I noted earlier, however, the state's interests are interrelated, and it is unrealistic to view each of the plaintiff's claims as separate and distinct. Mechanical restraints, when used properly in accord with preestablished procedures, can be an integral part of a treatment program.[5] Furthermore, restraints may be essential to protect the safety of the patients.[6] Whether this is the situation here is, of course, a question for the jury.
 
 
 98
 I believe that the jury should be instructed that physical restraint related to the provision of care or treatment violates the plaintiff's rights if the defendants' conduct was such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the defendants did not base their conduct on a professional judgment. Restraint for the convenience of the staff or for punishment serving no legitimate purpose would be a substantial departure from accepted professional judgment and thus a violation of the plaintiff's constitutional right to care and treatment. Of course, other prerequisites to establishing the defendants' liability also would have to be met.
 
 C. Treatment Claim
 
 99
 The plaintiff's final claim is that the defendants deprived him of his constitutional rights by not making available adequate treatment while he was confined in the Pennhurst hospital building. The plaintiff also appears to be asserting that he has a right to treatment in the least restrictive alternative. My discussion of the least restrictive alternative standard in the preceding section applies with equal force to the treatment claim. As a result, I agree with the majority's holding that least restrictive alternative analysis is inappropriate when assessing the adequacy of treatment already administered. I do not agree, however, that the standard articulated by the majority is a correct statement of what the Constitution requires, nor do I concur in the majority's promulgation of a three-tier framework for analyzing treatment claims.
 
 
 100
 The majority holds that when the jury finds that some treatment has been administered, it should determine whether the treatment is regarded as acceptable in light of present medical or other scientific knowledge. This standard is in effect the same standard that would apply in a state malpractice action. As noted previously, it is of vital importance to maintain the distinction between common-law tort actions and constitutional decisions. The "substantial departure from accepted professional judgment" standard preserves this distinction while accommodating the concerns of both the institutionalized mentally retarded and state officials.
 
 
 101
 The majority also divides treatment claims into three categories and formulates different standards of review for each category. I believe, however, that such distinctions are artificial and will lead to unnecessary complexity and confusion. See part II supra. The jury should be instructed to apply the "substantial departure from accepted professional judgment" standard to all aspects of the treatment claim. Inaction by the defendants or the use of restrictive procedures in treatment can, of course, be taken into consideration by the jury in determining whether professional judgment has been exercised.
 
 V.
 
 102
 The lamentable conditions that exist at Pennhurst have been detailed elsewhere. See Halderman, 612 F.2d 84. The institution is unsanitary and understaffed, and many of its residents are subjected to violence and enforced inactivity. I stand second to no one in condemning these conditions, and, as I emphasized in my dissent in Halderman, I believe that the federal judiciary has a duty to ensure that these conditions are eliminated. However, our duty in this case is only to establish minimum constitutional standards to govern the individual claims of a Pennhurst resident against certain Pennhurst officials. I would hold that the Constitution requires the district court to instruct the jury that the defendants' conduct comports with due process if it is not a substantial departure from accepted professional judgment. Because the majority's decision is inconsistent with this standard, I cannot join the opinion of the court.
 
 
 103
 ALDISERT, Circuit Judge, with whom Judge GARTH joins, concurring.
 
 
 104
 Although I join the concurring opinion of Chief Judge Seitz in all respects, I write separately to emphasize the two important differences, one conceptual and one pragmatic, that divide this court.
 
 I.
 
 105
 The concurring judges approach this troublesome problem in the grand tradition of the common law, precisely distinguishing between the elements of a due process deprivation and the elements of the state tort of medical malpractice. Chief Judge Seitz emphasizes with elegance and profound jurisprudential integrity that not all state law torts amount to due process deprivations. He contends that in the factual complex presented here, a prima facie case of a due process deprivation is established only by proof of "such a substantial departure from accepted professional judgment, practice, or standards ... as to demonstrate that the defendants did not base their conduct on a professional judgment," or, in other words, that the treatment technique employed was "a sham or otherwise illegitimate." Con. op. of Seitz, C. J., at page 178.
 
 
 106
 In the common law tradition, courts resolve disputes by examining the rules laid down by prior decisions. These are rules of law in the narrow sense, "precepts attaching a definite detailed legal consequence to a definite, detailed state of facts,"[1] or "fairly concrete guides for decision geared to narrow categories of behavior and prescribing narrow patterns of conduct."[2] The common law "creeps from point to point, testing each step"[3] and grows slowly by gradual accretion from the resolution of specific problems. Holmes noted that the great growth of the common law came about incrementally.[4] Courts fashion principles from a number of rules of decision, in a process characterized by experimentation. Rules of case law are treated not as final truths, "but as working hypotheses, continually retested in those great laboratories of the law, the courts of justice."[5] The common law tradition has been described as a method "of reaching what instinctively seem the right result in a series of cases, and only later (if at all) enunciating the principle that explains the pattern a sort of connect-the-dots exercise."[6]
 
 
 107
 Chief Judge Seitz adheres to this tradition in two respects. First, he sets forth a detailed legal consequence for the detailed set of facts in this case. By contrast, the majority's formulation is cast in terms of grandi astrazioni, predicating liability on notions of "substantial necessity," "compelling necessity," and "least intrusive means." These abstractions, dubbed in classroom jargon as constitutional law "buzz words," have the unfortunate capacity to mean all things to all people.
 
 
 108
 Second, Chief Judge Seitz develops the law incrementally, explaining how a respectable body of state tort law, built on thousands of fact situations resolved by courts over several centuries, is immediately available to the plaintiffs. If the plaintiffs prove egregious conduct constituting gross negligence and demonstrate that the treatment or lack of treatment may be fairly characterized as a sham, the plaintiffs would have available additional relief to cure the constitutional deprivation. Thus, he recognizes that the plaintiffs carry separate arrows in their quiver: state malpractice relief for certain levels of conduct falling below standards of reasonable medical practice, and federal relief under 42 U.S.C. § 1983 if the conduct is sufficiently egregious to violate the fourteenth amendment.
 
 
 109
 By approaching the case from the common law perspective, Chief Judge Seitz recognizes a tenet recently articulated by one of America's great law schools, to which I subscribe completely:
 
 
 110
 The United States, more than any other country, has been a country of law, laws, and lawyers; nowhere else is so much of the ferment of society expressed in terms of a Constitution.... We have come, however, to see that all the great issues of the day are not concentrated on constitutional law ... but that contemporary problems embrace and are informed by a variety of public law fields, from tax and administrative law to health, labor and penal law. We have come to see, also, that the traditional private law subjects contracts, torts, and property, for instance are more and more intertwined with considerations of public law and public interest; and further, that much of the traditional learning in these subjects is not revealed truth, but a reflection of values of society at given periods of time.[7]
 
 
 111
 Rather than creating overriding constitutional precepts that obfuscate the role of tort law in correcting institutional abuses, he relies on the Anglo-American tort law experience for a more principled resolution of this controversy.
 
 
 112
 Although the majority purport to recognize and preserve the distinction between claims under the Constitution and claims under state tort law, their decision actually blurs that distinction. By formulating a standard for constitutional deprivation low enough to be asserted in virtually all malpractice actions arising out of the treatment of the institutionalized retarded, the majority place a substantial burden on lay juries, who must avoid confusing the elements of these related claims. Notwithstanding my high regard for lay jurors, I doubt that medical professionals, much less laymen, can foresee the ramifications of the majority's due process standards.
 
 
 113
 In addition, by promulgating standards for due process claims that are facially almost indistinguishable from malpractice allegations, the majority have effectively extended federal jurisdiction into all malpractice claims arising in state institutions. Although diversity is currently required to litigate state tort claims in the federal courts, future plaintiffs will be able to assert, undoubtedly in good faith, that the state treatment had no "coherent relationship" to their needs, that they were restrained without "compelling necessity," or that they were left unprotected without "substantial necessity." These plaintiffs will be able to assert federal jurisdiction under 28 U.S.C. § 1343(3), and append their claims of malpractice. I do not doubt that the federal courts of this circuit will soon be repositories for all personal injury claims arising in state institutions for the mentally retarded. Indeed, that appears to be the majority's intent, for they advance the rather peculiar notion that these situations, in which a person has been committed to a state institution by a state process, subject to state control through state employees, present issues not primarily of state concern, but "fundamental issues of national import." Maj. op. at page 170. This expansion of jurisdiction deserves greater consideration than just one case.
 
 II.
 
 114
 The majority's abandonment of incremental decisionmaking in favor of promulgation of broad standards is not only methodologically offensive, but lacks utility for the groups most affected by this decision. As the preceding concurring opinion notes, the complexity and confusion of the majority's formulation "will affect both the ability of a jury to meaningfully assess liability and the ability of state officials like the defendants to effectively conform their conduct to these standards." Con. op. of Seitz, C. J., at page 174. But the confusion will not start at the door of the jury room. In making decisions on motions for summary judgment or directed verdict, the district judges will be grasping at ropes of sand when they attempt to perceive the current wisdom of "substantial necessity" in one category of behavior or "compelling necessity" in another. And to predict what a given panel of this court will do on review would be akin to interpreting the speech of Pythia after she chewed the laurel leaves at Delphi.
 
 
 115
 But many persons besides juries, judges, and legal philosophers must participate in this divining process. There are staff physicians and, more important, staff attendants. Staff attendants, even more than physicians, are responsible for the hour-by-hour operation of state mental institutions, and their activity has now become strictly regulated by amorphous constitutional law tenets. We can assume that these attendants have neither the intellectual acumen nor the constitutional law insight possessed by Anthony Amsterdam, Gerald Gunther, Archibald Cox, or Laurence Tribe. Yet the majority formulation now requires them to apply these new constitutional precepts in deciding, for example, whether to employ "soft restraints," metal shackles, or a leather muff to control a disruptive patient. See con. op. of Seitz, C. J., at page 179 n.3. As a result, staff attendants as well as staff physicians will be compelled to seek legal counsel. Their attorneys will then prophesy "what the courts will do in fact...."[8] The lawyers, even specialists in medical malpractice, public or hospital administration, or casualty insurance underwriting, will be hard pressed to formulate guidelines.
 
 
 116
 One obvious situation in which guidelines will be difficult to formulate comes to mind. The plaintiff here complained of seventy separate injuries. We can assume that some were self-inflicted; some were inflicted by fellow patients, retaliating from the plaintiff's aggressive behavior. The majority formulation makes it a violation of the United States Constitution to shackle one patient improperly, and a separate violation if an unrestrained patient attacks another patient. In the real world environment of a hospital ward the staff attendant must decide which constitutional right deserves protection. The decision must be made amid the cry and tumult of a mental hospital, not in the cloister of the Third Circuit law library, nor in the conference room of nine circuit judges who are divided five to four on a difficult problem.
 
 
 117
 It took centuries for the common law to move from thirteenth century notions of criminal trespass to the landmark decisions establishing trespass on the case, now modern day negligence.[9] It took the French from July, 1790, to March, 1804, to formulate the French Civil Code,[10] and the Germans from 1873 to 1896 to fashion the Burgerliches Gesetzbuch (BGB).[11] More recently, it took fifteen years of incremental development to produce strict liability for defective products.[12] Attorneys attempting to advise clients by predicting the effect of today's decision on specific fact patterns will be deprived of the body of law leading to the broad standards promulgated by the majority. Their ability to predict will suffer, and the persons most affected will be those who seek legal advice.
 
 
 118
 The majority's purpose is admirable. They recognize that the disposition of this case will presage an expansion of litigation involving the constitutional rights of the institutionalized mentally ill. In an attempt to aid the lower courts in dealing with the anticipated cases, the majority formulate general standards for evaluating these claims. But their approach does not accord with the common law adjudicatory tradition of proceeding gradually and empirically. The direction and instructions presented are thus founded not on experience, but on speculation. It is not surprising that this attempt to achieve predictability in disregard of the common law tradition achieves just the opposite result. All persons who must rely on these standards institutional staffs, physicians, their attorneys, district judges, and subsequent panels of this court will struggle to determine the context in which the claim arose,[13] and then to apply the appropriate standard for that context. The resulting confusion will undermine the majority's attempt to formulate universal precepts on a limited record. I predict that this court's current inexperience in this area will become increasingly apparent in subsequent cases.
 
 
 119
 The majority have failed to recognize that every new case is an experiment, and that if the accepted rule that seems applicable yields a result felt to be unjust, under the common law tradition, the rule is reconsidered. "(I)f a rule continues to work injustice, it will eventually be reformulated."[14] As Chief Judge Seitz explains, however, "(a) statute is relatively easy to change but the Constitution is not." Con. op. of Seitz, C. J., at page 178.
 
 
 120
 It has been almost twenty years since I faced a client across a law office desk. But were I to be placed in that position today, my advice would probably go like this: if you are contemplating a position as an attendant in a mental hospital, seek another job; there is simply too much unpredictability in the law governing your conduct. If you are a physician, make certain that the state's malpractice insurance policy includes a clause protecting you from the new "constitutional torts" manufactured today by the Third Circuit Court of Appeals. If you are an insurance carrier, set your premiums high, anticipating fully and completely the open-ended notions of "substantial" and "compelling" necessity and "least intrusive treatment." If you are a governor or state legislator, cut back and retrench institutional programs for the mentally retarded, because the potential for lawsuits has now increased geometrically, with corresponding demands on the tax base to support the costs. If you are a parent with a retarded child, I simply feel sorry for you. The sincere effort to provide financial relief for personal injuries suffered by retarded persons has been accomplished at an enormous social cost. In striking the balance between how seriously the complainants are being hurt and how much it will cost to afford them more relief than is presently available under state tort law, the balance has been struck so vaguely that state institutional programs, already diminishing, will be curtailed further. Given the recent political currents, there simply are not, and will not be, sufficient tax dollars, state or federal, to give the defendants adequate financial protection to meet the illusory standards promulgated today.
 
 
 121
 GARTH, Circuit Judge, with whom Judge ALDISERT joins, concurring.
 
 
 122
 I join in Chief Judge Seitz's concurring opinion. I write separately, however, to express my views with respect to a troubling feature of the majority opinion. As Chief Judge Seitz has recognized in note 1 of his concurring opinion, this case does not present claims involving nonreversible surgery or the administration of antipsychotic drugs. The majority concedes as much. Nonetheless the majority includes both of these procedures in its discussion (Maj. Op. pages 165, 166). That discussion is then apparently related to the jury charge which appears as III C in the Appendix (Maj. Op. page 173) requiring as a constitutional measure the application of a "least intrusive treatment" standard where "significant deprivations of liberty" occur.
 
 
 123
 The problem with including this discussion and this charge in this case is apparent. It is crystal clear that the Plaintiff here had neither alleged nor suffered from non-reversible surgery. Nor did he allege or suffer from being medicated with a powerful anti-psychotic drug. Thus, the entire discussion in the majority opinion which refers to these two conditions is gratuitous and constitutes no more than dictum. Moreover, while it may be contended that this discussion of surgery and drugs was only to illustrate the thesis that various standards are needed to accommodate different levels of medical treatment, by referring to procedures outside the Romeo record and crafting jury instructions which govern these procedures, the majority has trenched directly upon a case which does concern the administration of anti-psychotic drugs and which is pending before this Court. That case, Rennie v. Klein, Nos. 79-2576 and 79-2577, was argued before this Court on April 22, 1980. The filing of the panel's decision has been withheld by a majority vote of the full Court, pending the filing of the present en banc opinion.
 
 
 124
 Rennie deals with the issue of the involuntary administration of anti-psychotic drugs to mentally ill patients (as distinguished from mentally retarded patients, the focus of the Romeo case). In Rennie, the trial of this issue produced an extensive record which centered wholly on the administration of anti-psychotic drugs. That record, and the issues arising from it, were fully briefed and argued by the parties in Rennie before a panel of this Court. The decision in Rennie will therefore meet head-on the very issue of the requisite constitutional standards involved in the administration of anti-psychotic drugs which the Romeo majority by its equivocal discussion and purported adoption of a "least intrusive" standard seeks to influence, if not to establish, here. This has been sought to be accomplished notwithstanding the absence of an appropriate record in Romeo and without the benefit of analysis, argument, or briefing of the anti-psychotic drug issue by the parties in Romeo.
 
 
 125
 Thus, the multi-level series of standards adopted by the majority has now additionally resulted in bald dictum which purports to promulgate a legal standard involving the administration of anti-psychotic drugs a standard that is wholly inappropriate for resolution in this case and one that may very well be rejected or modified by the holding of this Court in Rennie v. Klein, supra, the case which presents that very issue.
 
 
 
 [1]
 In Halderman v. Pennhurst State School & Hospital, 612 F.2d 84 (3d Cir. 1979), cert. granted, 447 U.S. 904, 100 S.Ct. 2984, 64 L.Ed.2d 853 (1980), this Court held that the mentally retarded have a statutory right to treatment and habilitation, enforceable by a private right of action under the Developmentally Disabled Assistance and Bill of Rights Act, Pub.L.No. 94-103, 89 Stat. 496, 42 U.S.C. §§ 6001-6081 (1976). Although confinement of the mentally retarded and mentally ill raises many similar problems for constitutional purposes, it is necessary to be careful not to submerge relevant distinctions. As both the district and appellate courts found in Halderman, with respect to the individuals housed in Pennhurst:
 The residents are not mentally ill, have broken no laws, and are not a danger to others, although, in severe cases, some are unable to care for themselves. Mental retardation is an impairment in learning capacity and adaptive behavior, and is not treatable, like mental illness, by means of drugs or psychotherapy. While the mentally retarded do suffer educational difficulties, the level of their functioning can be improved by individualized training. 612 F.2d at 92.
 
 
 [2]
 The plaintiff's complaint and the various requests for charge do not describe the exact nature of the constitutional rights asserted by the plaintiff. For example, the plaintiff repeatedly refers to rights under the Eighth and Fourteenth Amendments. Inasmuch as the Eighth Amendment applies only to the state through the Fourteenth Amendment, it is at times unclear whether the Fourteenth Amendment is asserted as a separate legal basis or only ancillary to the Eighth Amendment theory. In any event, we have examined the record and will construe the complaint as asserting that the injuries inflicted on Romeo violated both a substantive due process right and a right to be free from cruel and unusual punishment
 
 
 [3]
 None of the defendants has contended on appeal that these allegations involve matters outside the scope of his assigned responsibilities at Pennhurst
 
 
 [4]
 The court requested an offer of proof and the proposed testimony was summarized out of the jury's presence
 
 
 [5]
 The court, however, did permit defendants to testify that Mrs. Romeo refused to authorize the use of a physical restraint program on plaintiff. Although defendants contended that this prevented the reduction of Romeo's aggressive behavior, the rejection of a treatment program would not appear, in itself, to be probative evidence with respect to responsibility or liability. An inquiry is needed to determine the suitability of the proposed treatment, whether rejection of therapy is a manifestation of a patient's illness or a consequence of valid concerns of guardians or relatives, and whether reasonable efforts were made either to deal with such rejection or to provide some other suitable treatment. Cf. Rouse v. Cameron, 373 F.2d 451, 459 (D.C.Cir.1966)
 
 
 [6]
 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)
 
 
 [7]
 441 U.S. 520, 99 S.Ct. 1861, 61 L.Ed.2d 447 (1979)
 
 
 [8]
 See Ingraham v. Wright, 430 U.S. at 668-71, 97 S.Ct. at 1410-12, Bell v. Wolfish, 441 U.S. at 535, 99 S.Ct. at 1872. Admittedly, Ingraham left open the possibility of applying Eighth Amendment analysis to mental institutions, see 430 U.S. at 669 n.37, 97 S.Ct. at 1411 n.37, but the determination in Wolfish the Eighth Amendment is inappropriate for analyzing conditions of pretrial detainees indicates rather clearly that a formal adjudication of guilt in a criminal prosecution is a precondition for Eighth Amendment protection
 
 
 [9]
 Plaintiff Romeo stands in a different posture from the ordinary citizen with respect to medical treatment: he is involuntarily confined for the very purpose of treatment or habilitation. See pp. 158, 162, 167, 168 infra. Unlike most members of the community he is not free to seek or reject medical services whenever he pleases
 
 
 [10]
 As the Halderman Court noted, although mental health policies have traditionally been within the states' police power, Congressional action in the field was justified by the constitutional underpinnings of the retarded residents' rights to protection and personal security. 612 F.2d at 98
 
 
 [11]
 See Estelle v. Gamble, 429 U.S. at 106, 97 S.Ct. at 292 (deliberate indifference standard adopted to distinguish medical malpractice cases cognizable under state tort law and those rising to level of constitutional abridgement with respect to prisoners). Although the concurring opinion purports to reject the deliberate indifference standard of Estelle, it is not clear that the standard which it advocates for judging constitutionally acceptable conduct that it "was not a sham or otherwise illegitimate" provides anything different, or realistically addresses the undeniable distinctions between an involuntarily confined retarded person's right and a convicted individual's right to protection or treatment
 
 
 [12]
 Cf. Vitek v. Jones, 445 U.S. 480, 489, 100 S.Ct. 1254, 1262, 63 L.Ed.2d 552 (1980); Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)
 It should be noted, however, that if plaintiff's claim is not among those rights protected by the Constitution, he may still have a statutory or common law claim adjudicated in the state courts or even in the federal courts under pendent jurisdiction. In Halderman, the Court held that retarded persons have both a private right of action under the Developmentally Disabled Assistance and Bill of Rights Act, and a state statutory right to habilitation. Halderman v. Pennhurst State School & Hospital, 612 F.2d 84, 97, 103, 107 (3d Cir. 1979), cert. granted, 447 U.S. 904, 100 S.Ct. 2984, 64 L.Ed.2d 853 (1980).
 
 
 [13]
 See Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1973). The aphorism that "There is no iron curtain drawn between the Constitution and the prisons of this country," id. at 555-56, 94 S.Ct. at 2974, would appear to carry equal force with respect to institutions for the mentally ill or the mentally retarded
 
 
 [14]
 Monaghan, Of 'Liberty' and 'Property,' 62 Cornell L.Rev. 495, 41l-12 (1977)
 
 
 [15]
 Cf. Bell v. Wolfish, 441 U.S. 520, 532, 99 S.Ct. 1861, 1870, 61 L.Ed.2d 447 (1979), which rejected a compelling necessity standard in holding that the "presumption of innocence" doctrine relied upon by pretrial detainees in that case did not state a sufficiently grave liberty interest to support such a rule. Although the majority in Wolfish suggested that even if detainees had relied on the right to be free from punishment, that right would not warrant adoption of the compelling necessity test, id. at 539, 99 S.Ct. at 1874, the situation of the confined mentally retarded is clearly distinguishable. Whereas pretrial detainees are incarcerated pursuant to a judicial determination of probable cause, the involuntarily committed mentally retarded are untouched by the criminal process. Moreover, 85% of the detainees were released within 60 days, id. at 524, 525 n.3, 99 S.Ct. at 1866 n.3, whereas persons in institutions for the mentally retarded often remain for life. When disabilities imposed in the course of confinement in a mental facility are as severe as shackling, the possibility of punishment and a right to be free from it in a constitutional sense, exists
 
 
 [16]
 This is not intended to suggest that a state may involuntarily confine a person solely on grounds of treatment when the individual does not desire any treatment
 
 
 [17]
 See In Re Bally, 482 F.2d 648 (D.C.Cir.1973). See also Bell v. Wolfish, 441 U.S. at 539 n.20, 99 S.Ct. at 1874 n.20 and Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168, 83 S.Ct. 554, 567, 9 L.Ed.2d 644 (1963), which view deterrence and retribution the traditional aims of punishment as outside the realm of legitimate nonpunitive governmental objectives
 
 
 [18]
 O'Connor v. Donaldson, 422 U.S. at 576, 95 S.Ct. at 2494 and Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), at a minimum stand for the proposition that simple incarceration, outside of the criminal system, is constitutionally impermissible. Of course, the mentally ill and the mentally retarded cannot be segregated into discrete categories of "dangerous to others," "dangerous to self," or "need for treatment." The very fact of an individual's dangerousness is inextricably linked to his/her need for treatment. Both theoretically and practically then, treatment is a right and rationale in every instance of involuntary civil commitment
 However, it should be noted that with respect to Pennhurst, this Court fully adopted the district court's finding that "(t)he residents are not mentally ill, have broken no laws, and are not a danger to others, although, in severe cases, some are unable to care for themselves." Halderman v. Pennhurst State School & Hospital, 612 F.2d at 92. The absence of any dangerousness to others only strengthens the state's obligation to provide treatment to such non-threatening individuals once the state undertakes to confine them.
 
 
 [19]
 Wolfish pointed out that the problems that arise in the day-to-day operations of a state institution are not susceptible of easy solutions. Courts undoubtedly should accord wide-ranging deference to the administrators and physicians in mental facilities with regard to the adoption and execution of policies and practices necessary for internal order and security. Normally, the expertise and responsibility for such operations are located in the legislative and executive branches. But such recognition would appear to be no justification or excuse for the abrogation of legal rights or the abandonment of the judicial obligation to protect such rights. See id. 441 U.S. at 541, 99 S.Ct. at 1875
 
 
 [20]
 The fact that Romeo was shackled is not disputed. See App. 1-15a and 1-21a
 
 
 [21]
 Pa.Stat.Ann. tit. 50 § 4422 actually forbids shackling, subject to two limited exceptions: (1) during transfer of a patient or (2) by order of the director or his designee for solely medical purposes in accordance with regulations of the department. The record does not disclose that defendants came within either of these two exceptions. See App. I-63a
 
 
 [22]
 Moreover, as the court in Wolfish conceded, were a detainee to be shackled and thrown in a dungeon, "it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish." Id. 441 U.S. at 539 n.20, 99 S.Ct. at 1874 n.20
 In the present case, the district court permitted Romeo to amend his complaint to include allegations that defendants had kept plaintiff shackled to a bed or chair in the Pennhurst hospital for long periods of time each day since the initial filing of the complaint. See App. I-15a. Although evidence of retaliation or the subjective motivation of defendants may aid in determining whether there has been punishment or in ascertaining an appropriate remedy, the question whether a constitutional right to freedom from punishment or bodily restraint has been violated should turn on the character of the punishment not the motivation of the officials. Cf. Estelle v. Gamble, 429 U.S. at 116, 97 S.Ct. at 297. (Stevens, J., dissenting).
 
 
 [23]
 Freedom from personal restraint was essentially all that due process "liberty" meant until the Civil War. See Shattuck, The True Meaning of the Term 'Liberty' in Those Clauses in the Federal and State Constitutions Which Protect 'Life, Liberty, and Property,' 4 Harv.L.Rev. 365 (1891). This is the same liberty that the Court in Addington, 441 U.S. at 425-27, 99 S.Ct. at 1809-1810, sought to protect by establishing a "clear and convincing" evidence standard for initial commitment proceedings with respect to the mentally ill
 
 
 [24]
 The analysis here and the reasoning in Vitek indicate that courts have a duty to guard against unnecessary personal restraints both at the confinement stage and with respect to later, intramural dispositions, which can range from maximum to minimum security. The Fourteenth Amendment does not cease protecting individuals simply because they are behind institutional gates. In Halderman v. Pennhurst, 612 F.2d at 112-13, this Court affirmed a portion of the district court's order mandating limitations on the use of physical and chemical restraints
 
 
 [25]
 In the present situation, the state, in fact, admitted that the use of restraints was subject to a special procedure, requiring, at the least, an order of a physician. App. I-63a. In addition, according to the statute, a physician's order should be supplemented by an order of the institution's director. See n.21 supra
 
 
 [26]
 Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed. 18 (1976), elaborated a three-part balancing inquiry which would indicate the procedural protections required by state action or by a decision such as we have here:
 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute requirement would entail. Id. at 334-35, 96 S.Ct. at 902-903.
 The applicable level of judicial review may also be determined by a similar weighing of relevant interests. Here, the individual interest in freedom from shackling is considerable; the risk of erroneous shackling is indicated by the institution's failure to follow its own procedures; and the state has no plausible, independent interest in shackling per se, since the state statute generally forbids such practices.
 
 
 [27]
 The "compelling necessity" and "least restrictive manner" tests are virtually indistinguishable standards for reviewing the conduct in question. They have been used interchangeably in resolving equal protection, due process and First Amendment claims. See Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)
 
 
 [28]
 While it will be explained later that "least restrictive" analysis does not appear to be an appropriate tool for evaluating ongoing treatment programs, the reservations regarding this standard expressed in § V infra are inapplicable to shackling claims. Shackling a discrete physical act of confinement is more analogous to an initial commitment than to the administration of an evolving medication program. Courts have been deemed competent in judging alternative environmental dispositions, ranging from outpatient services to confinement in a large state facility. See Halderman, 612 F.2d 84, 102 (3d Cir. 1979) (Congressional preference in Developmentally Disabled Assistance and Bill of Rights Act for establishing least restrictive standards for personal liberty). Shackling presents a similar question of degrees of physical restriction and would appear to be equally amenable to judicial measurement. And just as the Supreme Court sought to protect the substantial liberty interests implicated in an involuntary commitment proceeding by establishing a "clear and convincing" evidence test, see Addington v. Texas, 441 U.S. 418, 433, 99 S.Ct. 1804, 1813, 60 L.Ed.2d 323 (1979), the comparably tangible and fundamental threat to personal autonomy presented by shackling should be protected by a "compelling necessity" test
 
 
 [29]
 Indeed, "there are a number of psychiatrists and psychologists who regard punishment as a legitimate form of therapy and who believe that aversive behavior modification techniques may be freely used to satisfy a patient's right to treat." Cf. Schoenfeld, Recent Developments in the Law Concerning the Mentally Ill A Corner-Stone of Legal Structure Laid in Mud, 9 Univ. of Toledo L.Rev. 1, 17 (1977); Note, Civil Restraint, Mental Illness and the Right to Treatment, 77 Yale L.J. 87, 106 (1967)
 
 
 [30]
 The judiciary has recognized that "our constitutional duties require that the courts be ever vigilant to assure that the conditions of incarceration do not overstep the bounds of federal constitutional limitations." Campbell v. Beto, 460 F.2d 765 at 767-68 (5th Cir. 1972) quoted in Wyatt v. Aderholt, 503 F.2d 1305, 1315 (5th Cir. 1974). See also Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), aff'd 442 F.2d 304 (8th Cir. 1971). Further, in New York St. Ass'n for Retard. Child., Inc. v. Rockefeller, 357 F.Supp. 752 (E.D.N.Y.1973), the court noted that "One of the basic rights of a person in confinement is protection from assaults by fellow inmates or by staff." Although initial discussion of the right occurred in a prison setting, the court in Rockefeller employed the same standard in evaluating the institution for the mentally retarded in that case
 
 
 [31]
 In a somewhat analogous situation Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962), held that incarceration on account of mere status is constitutionally impermissible
 
 
 [32]
 Commitment based on reasons of dangerousness to others is, admittedly, more often a concern in confinement of the mentally ill and less likely to be a governing factor with respect to the mentally retarded. As noted in n.18 supra, the district court found that none of the Pennhurst residents were dangerous to others
 
 
 [33]
 Pertinent for present purposes is § 4401 which provides:
 "(c) whenever a court commits any person under any provision of this act, it may commit such person directly to a facility willing and able to receive him; otherwise, the court shall commit to a designated local or state facility, or to the Veterans Administration or other agency of the United States upon receipt of a certificate that the person is eligible for such hospitalization and there is available space for his care." (emphasis added)
 
 
 [34]
 While both the right to protection and the right to treatment may have characteristics of property entitlements in that they demand affirmative action from the state and are statutorily created expectations, they are also equally intertwined with the original loss of liberty through confinement and related to basic notions of human dignity. Therefore treatment and protection partake of both liberty and property interests, and it seems unnecessary, at least in the present context, to demarcate these rights in a narrow "either/or" fashion
 
 
 [35]
 The mentally retarded may well be a paradigmatic example of a discrete and insular minority for whom the judiciary should exercise special solicitude. Cf. United States v. Carolene Products, 304 U.S. 144, 152-53 n.4, 58 S.Ct. 778, 783-84 n.4, 82 L.Ed.2d 1234 (1938). The retarded cannot vote in most states and, with few community ties, sponsors or friends, have minimal impact on the political process. See J. Ely, Democracy and Distrust, 135-79 (1980)
 
 
 [36]
 Cf. Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (openness of schools to public scrutiny ensures effectiveness of common law remedies in deterring abuses)
 
 
 [37]
 Such a distinction is neither arbitrary nor unprecedented. In a similar effort at line-drawing, the Supreme Court in Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), attempted to give meaning to an earlier pronouncement that "Due process does not require that every conceivable step be taken at whatever cost to eliminate the possibility of convicting an innocent person." Id. at 145, 99 S.Ct. at 2695, citing Patterson v. New York, 432 U.S. 197, 208, 97 S.Ct. 2319, 2326, 53 L.Ed.2d 281 (1977). In Baker the Court found that detention for three days did not constitute a liberty deprivation, but that "mere detention pursuant to a valid warrant in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty ... without due process of law.' " 443 U.S. at 145, 99 S.Ct. at 2695. Here, we do not require that every conceivable step be taken to prevent a resident from ever becoming bruised. Rather, we recognize that 70 injuries may rise to the level of a cognizable constitutional claim
 
 
 [38]
 For example, the staff might determine that it is therapeutically more desirable to have an admittedly aggressive patient mingling with others instead of confined to an isolated cell. Although this finding would not absolve the defendants of their duty to protect, it might well explain incurring some bruises in the course of a comprehensive treatment goal
 
 
 [39]
 It is questionable whether this testimony would be admissible under the standard advanced by Chief Judge Seitz. Dr. Foxx was prepared to testify that "in his opinion, plaintiff's injuries were a direct result of the lack of programming and activities on the ward." Dr. Grover's opinion was, similarly, that the "excessive and potentially mutilating" injuries were a consequence of inappropriate programming. It is not clear whether either would be ready to testify that the programming was "such a substantial departure from accepted professional judgment" as to constitute "a sham," the test suggested by the concurring opinion
 
 
 [40]
 Although habilitation is the more accurate term for treatment of the mentally retarded this is not intended to negate the possibility of improvement or to convey a static image of the functioning abilities of retarded persons. To the contrary, Congress appears to have based the Developmentally Disabled Assistance and Bill of Rights Act, as well as other recent legislation affecting the mentally retarded, on an acceptance of a "developmental view" of the severely retarded now being advanced by retardation professionals. The Senate Report accompanying the Bill of Rights articulates the developmental view, as well as contending traditional views which the Congress rejected. In part, S.Rep. 94-160 at 27-28 says:
 .... Finally, there is the view that developmentally disabled individuals are 'diseased.' They are viewed as sick and in need of constant care. This leads to indefinite custodial care. This last model is gradually being replaced by a developmental view of mental retardation. Such a view stresses that all developmentally disabled individuals have potential for learning and growth.
 From this developmental model, it follows that custodial care which is predicated on the assumption that certain individuals are essentially incapable of development must be rejected. The newer developmental model emphasizes concrete program goals for individuals and therefore encourages evaluation based on specific outcomes.
 
 
 [41]
 See Katz, The Right to Treatment An Enchanting Legal Fiction? 36 U.Chi.L.Rev., 755, 766 (1969)
 
 
 [42]
 In Donaldson the jury found that "Donaldson was neither dangerous to himself nor dangerous to others, and also found that, if mentally ill, Donaldson had not received treatment." Id. at 573, 95 S.Ct. at 2492. Since there was no conceivable ground for confinement and Donaldson sought release, the Court held that Donaldson's constitutional right to freedom had been violated. That case is distinguishable from Romeo's insofar as: Romeo has received some treatment; the state's desire to care for individuals incapable of protecting themselves provides an additional justification for confinement; and Romeo is not seeking release. Admittedly, the situation with a mentally retarded person is different from that of a mentally ill person. Confinement for the latter is frequently of short duration, while confinement of the former is of considerably longer duration. In addition, treatment of the mentally ill may be more central than for the mentally retarded, for whom habilitation may be the prime factor. But while the mentally retarded are not curable as such, few are totally untreatable as may well be the case which some who are mentally ill. Therefore, instances in which no effective therapy exists, and in which treatment would be futile, potentially requiring a Donaldson-like release, are more likely to arise with the mentally ill. Cf. Schoenfeld, supra note 29, at 15-17
 
 
 [43]
 Because of the incomplete state of the record, it is unclear whether the administration of, for example, dangerous psychotropic drugs, which were found to be misused at Pennhurst, see Halderman v. Pennhurst, 612 F.2d at 93, is in issue with respect to plaintiff Romeo. In light of the fact that we are remanding this case, which has already consumed considerable judicial time, we deem it appropriate to address the panoply of possible treatment problems that may confront the district court in order to aid in a speedier disposition
 
 
 [44]
 Cf. Davis v. Hubbard, 506 F.Supp. 915 (N.D. Ohio, 1980), which undertakes an exhaustive examination of psychotropic drug use in institutions for the mentally ill and suggests that administration of such drugs, as well as inter alia, convulsive therapy, sterilization, and psycho-surgery, involve significant invasions of fundamental interests worthy of constitutional protection. Traditional treatments, the court noted, do not implicate these interests to the same degree
 
 
 [45]
 Of course, this does not dispose of those difficult mid-range situations which involve both the possibility of improvement and the risk of serious side effects. When individuals are the decision-makers the law, out of respect for personal autonomy, appears to allow them to err on the side of risk, see Parham v. J.R., 442 U.S. 584, 602-04, 99 S.Ct. 2493, 2504-05, 61 L.Ed.2d 101 (1979). When the state is the decision-maker, the converse would seem appropriate: such actions should err on the side of safety
 
 
 [46]
 The significant cases embracing the least restrictive concept as a constitutional principle primarily entail a single legislative enactment or a discrete state action. See, e. g., Illinois State B. of Elections v. Socialist Workers Party, 440 U.S. 173, 185, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979) (statute prescribing number of signatures required for listing on electoral ballot); Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (statute requiring noncommercial vehicles to bear license plates with "Live Free or Die" motto); Aptheker v. Secretary of State, 378 U.S. 500, 508, 84 S.Ct. 1659, 1664, 12 L.Ed.2d 992 (1964) (statute prohibiting issuance of passports to all members of Communist organizations); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) (statute requiring teachers to disclose all organizations to which they belong or which they support); Dean Milk Co. v. City of Madison, 340 U.S. 349, 354, 71 S.Ct. 295, 297, 95 L.Ed. 329 (1951) (ordinance requiring pasteurization of milk at approved plants within five miles of center of city)
 Where the term "least restrictive" has been applied to the mentally handicapped, it has had reference mainly to the initial environmental disposition, not to ongoing therapeutic regimes or medical prescriptions. See Welsch v. Likins, 373 F.Supp. 487 (D.Minn.1974); Lessard v. Schmidt, 349 F.Supp. 1078 (E.D.Wis.1972), vacated and remanded for a more specific order, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661, order on remand, 379 F.Supp. 1376 (E.D.Wis.1974); vacated and remanded on other grounds, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), order reinstated on remand, 413 F.Supp. 1318 (E.D.Wis.1976); Wyatt v. Stickney, 325 F.Supp. 781 (M.D.Ala.1971), enforced, 344 F.Supp. 373 (M.D.Ala.1972), 344 F.Supp. 387 (M.D.Ala.1972), aff'd in part sub nom. Wyatt v. Alderholt, 503 F.2d 1305 (5th Cir. 1974).
 
 
 [47]
 See Hoffman & Foust, Least Restrictive Treatment of the Mentally Ill: A Doctrine in Search of Its Senses, 14 San Diego L.R. 1100, 1141-42 (1977)
 In evaluating the meaning of the right to treatment, it is equally important to assess a program in terms of its adequacy and a highly relevant factor is the resident's opinion of, and reaction to, the treatment he is receiving. It is by no means clear that an individual resident would consider the least restrictive treatment to be the most adequate. See Katz, The Right to Treatment An Enchanting Legal Fiction? 36 U.Chi.L.Rev. 755, 780 (1969).
 
 
 [48]
 Parham established minimal procedures consistent with the Fourteenth Amendment for the voluntary commitment of mentally ill minors. Vitek prescribed the procedures due before the state can transfer a convicted person from prison to a mental hospital
 
 
 [49]
 (b) If upon examination it is determined that such person is in need of care at a facility, the examining physicians or director, as the case may be, shall immediately report to said court which may order the commitment of such person for care and treatment. (emphasis added) Pa.Stat.Ann. tit. 50, § 4406
 On July 8, 1976, § 4406 was declared unconstitutionally void for vagueness in Goldy v. Beal, 429 F.Supp. 640 (M.D.Pa.1976), although the legislature, in enacting the 1976 Mental Health Procedures Act, P.L. 817 on July 9, 1976 specifically provided that the provisions of the Mental Health and Mental Retardation Act of 1966 (§ 4401 et seq.) were preserved insofar as they relate to mental retardation or to persons who are mentally retarded. In order to continue commitments constitutionally under § 4406 the Department of Public Welfare consented to an October 28, 1976 order of the district court which established standards for involuntary commitment. These standards ("Goldy standards") are legally binding regulations which enhance the § 4406 provision. In conditioning commitment on a person's inability to provide for "his most basic need for nourishment, personal and medical care, shelter, self-protection and safety" the regulations represent that such needs will be provided by residential placement. See 6 Penn.Bull. 2884 (Oct.-Nov. 1976).
 
 
 [50]
 Similar to the right to protection and care, the right to treatment has both a constitutional base since it forms the ground for the initial liberty deprivation and also a statutory base. It can likewise be analyzed as a liberty interest or property entitlement. Cf. Brede v. Director for Dept. of Health, Etc., 616 F.2d 407 (9th Cir. 1980) (property entitlement to treatment at some state leprosarium)
 
 
 [51]
 Of course, if after receipt of the relevant medical testimony on retrial, it is ascertained that Romeo received no treatment during significant periods, then the jury should be charged in accordance with Appendix III A not III B
 
 
 [52]
 See generally, Bazelon, Foreward, 57 Geo.L.J. 676-79 (1969)
 
 
 [53]
 It has been contended that these medical uncertainties are greater with respect to the mentally ill, on which Addington focused, than in the case of the mentally retarded. For constitutional purposes, this difference would appear insignificant, insofar as a "medically reasonable" standard for ongoing treatment decisions would appear proper for both groups
 
 
 [54]
 Cf. San Antonio Independent School District v. Rodriquez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Although both were Equal Protection cases, they dealt with an analogous question of what constitutes an adequate provision of public services or funds
 
 
 [55]
 While least intrusive analysis is relatively easily applied when the liberty interest infringed is freedom from bodily restraint, in the case of shackling, or involves conditions of confinement minimum vs. maximum security see Halderman, supra; Eubanks v. Clarke, 434 F.Supp. 1022 (E.D.Pa.1977), it merges into questions of medical judgment when the most appropriate method of administering treatment arises. This is not to suggest that such analysis may not be desirable: "least intrusive" may well be the most effective tool for reconciling the treatment needs of individuals, the concerns of libertarians and questions of the proper allocation of limited state funds. Chief Justice Burger's concern in O'Connor, that a "right to treatment" might provide a ready excuse for needlessly incarcerating socially undesirable individuals, might well be minimized by the least intrusive approach. 422 U.S. at 589, 95 S.Ct. at 2500. And the issue addressed in Addington, that "the State has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others," 441 U.S. at 426, 99 S.Ct. at 1809, which the court found to be inadequately served by use of a weak "preponderance" standard in commitment proceedings, might well be furthered by employment of the least intrusive standard
 
 
 [56]
 It would not appear that the Supreme Court's summary dismissal for want of a substantial federal question in Sanchez v. New Mexico, 396 U.S. 276, 90 S.Ct. 588, 24 L.Ed.2d 469 (1970), dismissing appeal from State v. Sanchez, 800 N.M. 438, 457 P.2d 370 (1969), which held that an admittedly dangerous patient did not have a right to the least restrictive environment, forecloses inquiry into the matter here. Recent Supreme Court decisions have indicated that summary dispositions are not ironclad rulings, and that their precedential force may well be modulated by subsequent doctrinal developments. See Illinois State Bd. of Elec. v. Socialist Workers Party, 440 U.S. 173, 183, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979); Washington v. Yakima Indian Nation, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979); Mandel v. Bradley, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977). There have been substantial doctrinal developments since Sanchez in the mental health field, ranging from the Court's O'Connor decision to the decisions of circuit and district courts recognizing some sort of right to treatment in the least restrictive setting. And in the interim, Congress has also determined that treatment in the least restrictive setting is appropriate to effectuate and protect the rights of the mentally retarded. See 42 U.S.C. §§ 6001-6081 (1976) (Developmentally Disabled Assistance and Bill of Rights Act). Moreover, our declination to recognize an across-the-board constitutional right to treatment in the least restrictive alternative precludes a square conflict with Sanchez
 
 
 [57]
 The court's role, in this respect, is somewhat similar to its function when reviewing action by administrative agencies. The standard of review articulated over a decade ago in Tribby v. Cameron, 379 F.2d 104 (D.C. Cir. 1967), remains valid today: the hospital need not necessarily make the best decision, just a permissible and reasonable one. Intelligent judicial review must rely on a well-reasoned analysis by the institution and a record of its treatment decisions. Covington v. Harris, 419 F.2d 617, 626 (D.C. Cir. 1969). Moreover, we recognize that this creates only a narrow judicial guarantee that those confined for treatment and who both seek and require it will receive it. The courts have not, as yet, begun to address whether there is a duty of all involuntarily confined residents to submit to some treatment
 
 
 [58]
 One effective means of resolving complaints regarding treatment programs would be for the institution to provide an internal grievance mechanism with appropriate procedural safeguards. This is not to suggest, however, that a full trial-type proceeding be employed. The adversary character of a full legal hearing is often not suited to the medical determinations at issue in treatment decisions. As the Supreme Court stated in Parham v. J.R., "due process is not violated by use of informal, traditional medical investigative techniques." Id. 442 U.S. at 607, 99 S.Ct. at 2506. Adversary proceedings might well be counterproductive to the establishment of a therapeutic alliance between physician and patient. And the state interest in avoiding disruption and unnecessary intrusion into medical judgments, as well as the patient's interest in impartial diagnosis, may best be served by providing for independent decisionmakers from within the institution. See Vitek v. Jones, 445 U.S. 480, 499, 100 S.Ct. 1254, 1266, 63 L.Ed.2d 552 (March 25, 1980)
 
 
 [59]
 Admittedly, the intent element of "deliberate indifference" is absent, but that aside, the standard propounded by the concurrence guarantees little more than the Eighth Amendment's proscription of callous indifference to the serious medical needs of prisoners
 
 
 [60]
 There has been no suggestion or argument made in this case regarding the possibility of different standards for the compensatory and punitive damages claims. While it may be desirable to differentiate such charges and to require explicitly a knowledge or state of mind element in punitive claims, the development of such distinctions must await a more fully adumbrated record
 
 
 [61]
 This written response to any objections of the plaintiff may well include consideration of relevant local rules limiting the number of attorneys who may participate, e. g., E.D. Pa. Local R. 33(a), especially where, as here, representation is joint rather than several. Because the complaint sought money damages from the defendants in their individual, not official, capacity, the Attorney General's duty or option to defend lawsuits against state employees may be no different in such an instance from that of an insurance carrier under a contract
 
 
 [62]
 See Trial Transcript, Vol. 8, p. 21. It should be noted that in the original class action litigation alleging state and federal statutory as well as Constitutional violations and involving an admittedly different set of Pennhurst officials and plaintiffs, the district court found that "the defendants have met their burden of convincing us by a preponderance of the evidence that they are entitled to the good faith immunity from damages afforded to such officials in connection with the injuries suffered by the named plaintiffs." Halderman v. Pennhurst State School and Hospital, 446 F.Supp. 1295, 1324 (E.D.Pa.1977) aff'd and modified, 612 F.2d 84 (3d Cir. 1979)
 
 
 [1]
 The existence of a qualified immunity defense is not raised on this appeal. Consequently, I will not address this question even though it is discussed in the majority opinion
 I also emphasize that, as the majority appears to concede, this appeal does not present claims involving nonreversible surgery or the administration of antipsychotic drugs. Therefore, in my view the majority opinion would not be controlling if such claims were asserted in other litigation.
 
 
 [2]
 The procedures used to commit the plaintiff are not at issue here. See generally Secretary of Public Welfare v. Institutionalized Juveniles, 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979). Nor is it significant that the plaintiff's mother, and not the state, applied for his commitment. See Halderman, 612 F.2d at 94. Accordingly, those factors have no bearing on the analysis that follows
 
 
 [3]
 Testimony at the trial demonstrated that the plaintiff was restrained in three different ways. When restraints were used the plaintiff was generally in "soft restraints." These restraints allow limited freedom of movement and confine a resident to the same area by securing his arms or legs to a chair or bed. Sometimes metal shackles were used on the plaintiff. This type of restraint consists of a metal wrist or leg band to which a leather belt is attached. The leather belt is tied to a chair or bed to restrict the resident to that particular area. Finally, the plaintiff was occasionally restrained by a leather muff around his hands. See Trial Transcript, vol. 4, at 170-71; vol. 7, at 50-56
 
 
 [4]
 The holding in Halderman that the Developmentally Disabled Assistance and Bill of Rights Act was enacted under § 5 of the 14th amendment does not mean that the legal standard of that statute that patients have a right to treatment in the least restrictive environment controls the disposition of the constitutional issues here. See Halderman, 612 F.2d at 98. In Halderman we held only that the statute was a permissible exercise of Congress' § 5 enforcement power. The distinction between § 5 and § 1 of the 14th amendment is crucial because Congress may proscribe conduct that a court would not find unconstitutional. Indeed, the test under § 5 is that normally associated with the necessary and proper clause. See, e. g., Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Thus the court's holding in Halderman, which relied on Katzenbach v. Morgan (see 612 F.2d at 98 & n.18), merely means that the standard in the Developmentally Disabled Assistance and Bill of Rights Act is permissible under the necessary and proper clause. The test normally associated with the necessary and proper clause, however, is not an appropriate method of analyzing what due process requires as a minimum
 
 
 [5]
 Pennsylvania law establishes one such procedure by requiring that mechanical restraints be used within an institution only when "the director of a facility or his designee determine that (restraints) are required by the medical needs of (a) person admitted or committed." Pa.Stat.Ann. tit. 50, § 4422 (Purdon 1969). Testimony at the trial showed that the plaintiff was restrained only on the order of a licensed physician. The majority, however, appears to assume that the defendants did not comply with § 4422 because the physician's order was not supplemented by an order of the director of Pennhurst. See majority op. at nn.21 & 25. But it is not clear to me that physicians employed at Pennhurst cannot be the director's "designee" within the meaning of the statute. Moreover, this issue is not raised on appeal and was not briefed by the parties
 
 
 [6]
 Protection may include both protection from self and protection from others. Confinement in a hospital may present special problems because of the presence of medical equipment and supplies and the fragile health of many patients. For example, testimony at the trial indicated that profoundly retarded residents often need to be restrained when confined in the Pennhurst hospital building because other patients are in traction or receiving intravenous fluids. See Trial Transcript, vol. 7, at 40-41, 76
 
 
 [1]
 Pound, Hierarchy of Sources and Forms in Different Systems of Law, 7 Tulane L.Rev. 475, 482 (1933)
 
 
 [2]
 Hughes, Rules, Policy and Decision Making, 77 Yale L.J. 411, 419 (1968)
 
 
 [3]
 A. Whitehead, Adventures of Ideas ch. 2, § 6 (1967)
 
 
 [4]
 Holmes, The Path of the Law, 10 Harv.L.Rev. 457, 468 (1897)
 
 
 [5]
 M. Smith, Jurisprudence 21 (1909)
 
 
 [6]
 Ely, The Supreme Court 1977 Term, Foreword: On Discovering Fundamental Values, 92 Harv.L.Rev. 5, 32 (1978) (citing Amsterdam, Perspectives of the Fourth Amendment, 58 Minn.L.Rev. 349, 351-52 (1974)). See also Arnold, Professor Hart's Theology, 73 Harv.L.Rev. 1298, 1311-12 (1960); Holmes, Codes and the Arrangement of the Law, 44 Harv.L.Rev. 725, 725 (1931)
 
 
 [7]
 Curriculum Committee Report, New York University School of Law, November 30, 1978, reprinted in An Introduction to New York University School of Law, Juris Doctor (J.D.) Program 1980-1981 (cover page)
 
 
 [8]
 Holmes, supra note 4, at 461
 
 
 [9]
 See W. Prosser, Handbook of the Law of Torts ch. 2, § 7 (4th ed. 1971)
 
 
 [10]
 See A. von Mehren & J. Gordley, The Civil Law System 48-51 (2d ed. 1977)
 
 
 [11]
 See id. at 73-77
 
 
 [12]
 This development is generally measured from Roger J. Traynor's concurring opinion in Escola v. Coca Cola Bottling Co., 24 Cal.2d 453, 457, 150 P.2d 436, 440 (1947) (Traynor, J., concurring), to his majority opinion for the court in Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 377 P.2d 897, 27 Cal.Rptr. 687 (1962)
 
 
 [13]
 The three contexts are physical restraints, which must be justified by "compelling necessity," maj. op. at page 160, protection from physical attacks, the absence of which must be justified by "substantial necessity," maj. op. at page 164, and adequacy of treatment, which must be justified by "a coherent relationship between a particular treatment program and a resident's needs," maj. op. at page 170
 
 
 [14]
 M. Smith, note 5 supra, at 21